UNITED STATES of America, Appellee,

v.

Edward Lester WENZEL, Appellant.

No. 8612.

United States Court of Appeals Fourth Circuit.

Argued Sept. 26, 1962.

Decided Dec. 7, 1962.

Charles W. Bell, Rockville, and Herbert W. Jorgensen, Takoma Park, Md., (Edward A. Palamara, Rockville, on brief), for appellant.

Daniel W. Moylan and J. Hardin Marion, III, Asst. U. S. Attys. (Joseph D. Tydings, U. S. Atty., on brief), for appellee.

Before SOBELOFF, Chief Judge, BOREMAN, Circuit Judge, and JOHN PAUL, District Judge.

JOHN PAUL, District Judge.

An indictment was returned in the District of Maryland containing five counts in one of which (Count No. 1) eleven persons including the appellant were charged with conspiracy to violate sections 472 and 473 of Title 18 United States Code, which relate to the possession, sale, utterance, etc., of counterfeit money. The remaining counts of the indictment charged various ones of the conspirators with substantive offenses growing out of their conspiratorial ac-

tivities. Appellant was charged in Count 2 with possessing and in Count 3 with transferring and delivering counterfeit money.

When brought to trial six of the alleged conspirators pleaded guilty; one was a fugitive, and one had been killed prior to the trial. The remaining three, consisting of the appellant, one Carl Mucherino and one Ernest Clifford Anglin, Jr., stood trial. Appellant was found guilty under both the conspiracy and the substantive counts. Mucherino was convicted on the conspiracy count and on Count 3. Anglin was found not guilty.

On this appeal the appellant appears not to question the force of the evidence against him, but charges that the trial court committed error in the following respects:

(1) In not granting appellant's motion for acquittal, or for a new trial, on the ground that the indictment charged a single conspiracy whereas multiple conspiracies were proved.

(2) In admitting in evidence an incomplete confession of appellant.

(3) In refusing to interrogate the jury as to whether they had read newspaper articles relating to the trial.

(4) In refusing to give to appellant's counsel parts of reports made by agents of the U. S. Treasury Department to their superior officers concerning their investigation of the case.

We find no merit in any of these assignments of error. We take them up for discussion in order:

### The Conspiracy.

The evidence produced by the Government tended to show that on December 6th or 7th, 1960, about $45,000.00 in counterfeit $20.00 Federal Reserve notes was brought from Newark, N. J., into Maryland by Carl Mucherino or by some one acting for him and at his direction, and that the counterfeits were delivered to a man named Agresti.

On the afternoon of December 7th Agresti met at his home with a group of his associates, including the appellant,

E. C. Anglin and Charles Eugene Lockett, at which time the counterfeits were displayed and counted and plans discussed for passing them. Later on the same day a further meeting was held at the apartment of Agresti's girl friend at which there were present the same four persons and also Carl Wenzel, a son of the appellant. At this meeting it was decided that Lockett should be given a portion of the counterfeit notes and, accompanied by Carl Wenzel, should embark on a trip for the purpose of putting them in circulation. When the meeting broke up a package containing some of the counterfeit notes was given to the appellant by Agresti to be held by appellant until Agresti should later pick it up. A day or so later this package was called for by Agresti or by one of his associates.

Lockett and Carl Wenzel left the same night, going first to Pittsburgh; thence to Akron, Ohio, and then on to Cleveland, in all of which communities they passed some of the money. Carl Wenzel left Lockett in Cleveland and returned to Maryland. Lockett remained in Cleveland a short while and while there met one Jerry Powell, who assisted him in passing more of the money in that city. At this time Lockett also talked with Powell about going to Atlanta, Georgia; and a few days thereafter, when Lockett had returned to Maryland, Powell telephoned him and they completed arrangements to meet in Atlanta, which they did a few days later.

After getting rid of some of the spurious notes in Atlanta they went up to Powell's home-town in North Carolina, where they enlisted the aid of Wayne Powell, an uncle of Jerry's. The trio then visited various cites in North and South Carolina, in all of which they uttered some of the counterfeits. During the time they traveled in an automobile in which Lockett had driven to Atlanta and which was owned by Agresti.

On December 18th appellant was present at another meeting at Agresti's home attended by several other of the latter's associates. On leaving this meeting appellant, at Agresti's request, again took

a bundle of the counterfeit notes to be held until called for.

On December 22nd Carl Mucherino again appeared in Maryland. The testimony supports the inference that Mucherino had not until then been paid for the counterfeits which he had supplied and that he came down for the purpose of either getting payment or retrieving such of the notes as Agresti still had. Early in the morning of December 22nd William Joyce, another of the conspirators, went to appellant's home to pick up the package that Agresti had entrusted to appellant on the 18th. Joyce told appellant that Agresti had sent him to get the package and that "he was sending the money back." After receiving the package (which contained $30,000.00 of bogus notes) Joyce, following instructions from Agresti, proceeded to a previously designated meeting place where he met Mucherino and delivered the package to him.

On the same morning Agresti had a talk with Morris (Sonny) Anglin in which he induced Anglin to arrange to satisfy the financial demands of Mucherino, in return for which Anglin was to receive the $30,000.00 of counterfeit notes. After Agresti had met Mucherino and the latter had agreed to the proposed arrangement, Agresti, Anglin, Joyce and Mucherino met the same afternoon in Anglin's apartment at which time Mucherino, after having his demands satisfied, turned the package of $30,000.00 over to Anglin. On receiving the counterfeits Anglin called a friend of his, one Roberts, in the city of Washington and later this same afternoon this pair started passing the notes in a large suburban shopping center. In the course of this attempt Anglin and Roberts escaped arrest only by running when a clerk in one of the stores suspected the character of the notes and called the police.

There appears no further passing of any of the counterfeits and the various members of the conspiracy were apprehended and taken in custody in the weeks following. Appellant was arrested on February 1, 1961.

It is difficult to see upon what appellant bases the argument that the evidence disclosed a number of conspiracies rather than the single one set out in the indictment, and neither his brief nor oral argument illuminates this contention. Reference is made to various meetings or activities in each of which some, but not all, of the conspirators participated; and the argument apparently is that each of these represented a separate conspiracy comprising only the individuals present or participating. There is plainly no merit in this. It is fundamental that it is not necessary that every act undertaken in carrying out the object of a conspiracy should be participated in by every member of the conspiring group. In carrying out the purpose of a conspiracy it will be found that in practically every case different groups played different parts. To unite them in a single conspiracy it is only necessary that the activities of each individual or group be directed toward accomplishing a single criminal objective. See Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154; Jezewski v. United States, 6 Cir., 13 F.2d 599, 602; Poliafico v. United States, 6 Cir., 237 F.2d 97, 104–105.

The pattern of this conspiracy was plain and uncomplicated. It had for its object the realization of profit by the foisting upon the public of counterfeit money. To accomplish this the counterfeits had to be obtained and they had to be put in circulation. Mucherino furnished the money to Agresti and the latter, along with appellant and other associates, arranged to put it into circulation by Lockett and the younger Wenzel. It is immaterial that Mucherino or Agresti or the appellant may not have known the persons that Lockett recruited to help him in uttering the money, or that these persons were not among the group which originally planned the illegal enterprise. Poliafico v. United States, supra p. 104; Hagen v. United States, 9 Cir., 268 F. 344, 346; Marino v. United States, 9 Cir., 91 F.2d 691, 696; United States v. Lester, 3 Cir., 282 F.2d 750;

Allen v. United States, 7 Cir., 4 F.2d 688, 692; United States v. Babcock, C.C., Fed. Cases No. 14,487; Daily v. United States, 9 Cir., 282 F.2d 818, 820; United States v. Bruno, 2 Cir., 105 F.2d 921; Craig v. United States, 9 Cir., 81 F.2d 816, 822, in which latter case it is said:

"(a)ctors may drop out, and others drop in; the details of operation may change from time to time; the members need not know each other, or the part played by others; a member need not know all the details of the plan or the operations; he must, however, know the purpose of the conspiracy and agree to become a party to a plan to effectuate that purpose."

And in Poliafico v. United States, supra, we find:

"Knowledge of membership in the conspiracy, the part played by each of the members, and the division of spoils is immaterial. * * * The addition of new members to a conspiracy or the withdrawal of old ones from it does not change the status of the other conspirators."

And in Marino v. United States, supra, it is said (91 F.2d p. 696):

"In the situation where a conspiracy has been formed, the joinder thereof by a new member does not create a new conspiracy, does not change the status of the other conspirators, * * *."

### The Alleged Interrupted Confession

The appellant was arrested at his service station at Hyattsville, Md., on February 1, 1961, by several agents of the Secret Service. He was taken before a United States Commissioner at Bethesda, Md., and, being unable to give bond at that time, was committed to jail. The testimony of the officer having custody of the appellant was that while at the Commissioner's office the appellant was shown a statement made by his co-conspirator Lockett—who, presumably, had been previously arrested. On reading this statement the appellant, who had until then made no admissions, said "you guys have got everything, there's no sense in me playing games now."

Further testimony was that on the way to the jail the officer and appellant kept up a conversation in the course of which the appellant related the circumstances and extent of his involvement in the counterfeiting enterprise. His recital varied from the facts heretofore recited in no material particular. He did say, however, that when sometime prior to December, 1960, he had turned over to Agresti $2,000.00 for investment he did not know the nature of the venture which Agresti was undertaking, but that when the bogus money was received he felt that he had to go along with the illegal plan to protect his investment. Any conversation was ended when the jail was reached and appellant was locked up. The agent said that he would like to have continued the conversation further, but that he had other duties to perform that night and he turned appellant over to the jailer to be locked up. The appellant moved to strike this testimony on the ground that it involved an interrupted and incomplete confession.

The objection to the introduction of an interrupted or unfinished confession emanates from the broader principle that when a confession is introduced it is the defendant's right that all, and not just a part of it, be produced. In 20 Am.Jur. 425, the general rule is thus stated:

"When a confession is admissible, the whole of what the accused said upon the subject at the time of making the confession is admissible and should be taken together; and if the prosecution fails to prove the whole statement, the accused is entitled to put in evidence all that was said to and by him at the time which bears upon the subject of controversy including any exculpatory or self-serving declarations connected therewith."

As an outgrowth of this and founded on the same reasoning it has been held improper to admit a confession which, after admitting the commission of the

criminal act, is interrupted thereby preventing the defendant from adding anything which might explain the reason for his conduct or serve to condone it. These holdings have no application to the instant case. The only case cited by appellant, William v. State (1864), 39 Ala. 532, presents a different situation. In that case a negro slave came to his master and told him that he had killed another female slave. When the master asked when and how he had killed the woman the answer was that he had killed her "At the gin house" and "I cut her throat." Upon learning this the master stopped him and would not allow him to make a further statement. A similar case (though not cited by appellant) is State v. Isaac (1848), 3 La.Ann. 359, where a witness testified that "the accused came to him the morning after the affray, and told him that he had killed the slave Jim and commenced justifying the act, when the witness stopped him and told him that he intended to deliver him over to be punished."

In both of the cases the courts held the confessions inadmissible on the ground that the accused had been prevented from adding anything that might have exculpated him or lessened the gravity of his act. Obviously the rule which frowns upon incomplete confessions is designed to cover cases where an accused, after admitting commission of the criminal act, is prevented from going further and saying anything which might explain or justify his act. No such situation exists in the instant case. The testimony indicates that the appellant voluntarily told of his connection with the counterfeiting enterprise, that he talked freely and said everything he wanted to say, including his statement that he had invested in the enterprise in ignorance of its nature and went along with it only because he hoped to recoup his investment. There is no evidence, and no averment, that he left anything unsaid or that he desired to talk further or that he would have done so. And it may be said that the contentions of the appellant appear all the more unwarranted when it is noted that at the trial of this case the appellant testified in his own behalf at great length, at which time he utilized to the fullest the opportunity to picture himself as an innocent victim.

### The Admonition of the Court Concerning Newspaper Articles

The appellant next complains that the Court erred in refusing a request of appellant to interrogate the jury as to whether they had read newspaper articles concerning the trial. The assignment of error approaches the trivial and is entirely without merit.

The record indicates that prior to the beginning of this trial the Chief Judge of the District (Judge Thomsen) had made a talk to members of this jury (and possibly other prospective jurors) in which he spoke generally of the responsibilities, duties and conduct of jurors. Among other matters he had admonished them against reading newspaper accounts of the trial and of talking to anyone about the case. The jury was chosen and impaneled on the afternoon of December 4, 1961, and adjournment was then taken until next morning. At the opening of court next day (Dec. 5) counsel for another of the conspirators called the Court's attention to an article in the Baltimore Sun of that morning, stating that he considered it prejudicial and asked the Court to inquire of the jurors as to whether any of them had read it. The trial judge (Judge Northrop) posed the question to the jurors and apparently they all answered in the negative since the transcript shows no further objection or statement from any of the defendants. Nevertheless, the Court, out of abundant caution and with emphasis again instructed the jury that they should not read any newspaper articles about the case or discuss it with anyone. Again when Court adjourned on the afternoon of December 6th the jury was admonished about reading newspapers or discussing the case. The same instruction was given the jury at adjournment on December 7th.

On the morning of December 8th, the fifth day of the trial, counsel for

appellant asked the Court to inquire of the jurors whether they had read any newspaper accounts of the trial. Particular reference was made to an account in the Baltimore Sun of December 6th. The Court, with an unusual but commendable display of patience, explained to counsel that the jury had been instructed at length and repeatedly regarding its duties in this connection and that in response to a similar inquiry several days before the jurors had given assurance that they were following these instructions. The Court added that to inquire each day whether its instructions were being obeyed would indicate a mistrust of the jury and a reflection upon the integrity of its members. It, therefore, declined to interrogate the jury further. The episode forms the basis for this assignment of error, which is without any substance. To start with the news account of December 6th, which has been exhibited to the Court, cannot be said to be prejudicial in any sense. It is a rather short account of the opening day of the trial. It mentions briefly the contents of the opening statement by the District Attorney. It states that the indictment originally named eleven conspirators, but that only three were on trial; that six had previously pleaded guilty, one was a fugitive and one had been killed before the trial. All of these things were facts and proper items of news. Furthermore no question was raised as to the propriety of this news article on the day of its publication and it was not until several days later and after (to use the language of appellant's counsel) "a crushing amount of evidence" had been presented against the defendants that counsel advanced this misty charge of prejudice.

### The Motion Under the Jencks Act

In the course of the trial the Government presented as a witness William R. Holmes, an agent of the Secret Service, who had participated in the investigation of this case. In his testimony in chief this witness stated that he had arrested Morris (Sonny) Anglin on January 10, 1961, in Arlington, Va., and had found in his possession 389 of the counterfeit notes. He further testified that on January 4th he had gone to the home where he thought Charles Lockett lived, but found that Lockett had moved. However, in searching the premises he discovered a paper showing that Lockett, while in Florida, had wired $15.00 to Jerry Powell in Atlanta. This, aside from identifying the counterfeits, was the extent of his testimony on direct examination.

On cross-examination this witness stated that some days later (presumably after Lockett had been arrested) he interrogated Lockett and took a statement from him. He also testified that on completion of his investigation he made a report on the case to his superiors and that Lockett's statement was filed with that report. Thereupon, and without more, counsel called upon the District Attorney "to produce the statement"—presumably meaning that given by Lockett. The Court pointed out that Lockett's statement might well contain matter adverse to other defendants and counsel for Mucherino objected to production of the statement for the same reason and because such adverse matter would come before the jury without opportunity for cross-examination of its author.

After some discussion and after an examination of Agent Holmes' report the Court offered to furnish to counsel that part of the report relating to all of the matters to which Holmes had testified, namely, the arrest of Sonny Anglin, the finding of counterfeit money in his possession, and the result of the agent's visit to Lockett's lately-vacated home. Inasmuch as this covered the entire testimony of this witness it is clear that the Court offered to appellant's counsel all, and probably more, than he was entitled to. In response to this offer counsel answered that "We respectfully decline to accept the reports as presented by your Honor," and insisted on the production of the agent's entire report, saying:

"My position is this, that we have under the so-called Jenck's right

(sic) an unquestioned right to get this man's report, and it's our position that part of his report is Lockett's statement, and we say we are entitled to every part of Lockett's statement that pertains to every defendant indicted in this case regardless of whether it was gone over on direct examination or not."

Counsel misunderstands the purpose and scope of the case of Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, and of the subsequent legislation, commonly known as the Jencks Act, which clarified and limited the application of that case. In the case of Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287, the Supreme Court, speaking through Mr. Justice Frankfurter, goes into detail as to the purposes of both the case and the legislation and makes clear that each had the purpose of affording opportunity for impeachment of a witness.

So much of the Jencks Act (18 U.S. C.A. § 3500) as is pertinent here reads:

"(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case."

Further sections of the Act (b) and (c) provide that there shall be delivered to the defendant such portions of the statement as "relates to the subject matter as to which the witness has testified" and direct the Court to withhold these portions of the statement which do not relate to the subject matter of the testimony of the witness.

In Palermo v. United States, supra, at page 349, 79 S.Ct. at page 1223, the Court says in regard to subsection (a) (hereinbefore quoted):

"This section manifests the general statutory aim to restrict the use of such statements to impeachment."

If the report of Agent Holmes had been sought for the purpose of impeaching him, then the appellant had offered to him everything to which he was entitled, namely, all portions of the report which related to Holmes' testimony at the trial—This he rejected. But the appellant was not trying to discredit Agent Holmes. What he was seeking was the disclosure of the contents of the statement Lockett had given to Holmes. In argument to the Court counsel specifically avowed that this was his purpose. But Lockett was not testifying. He had never been a witness in the case and no part of his statement had been disclosed by the witness Holmes. Under such circumstances it is plain that the Court's action was correct. It is equally clear that disclosure of Lockett's statement was so eagerly sought by appellant not to impeach the testimony of any witness, but in order to find out what information Lockett had given the Government and how far he had involved his fellow conspirators. The statute was not aimed to aid any such purpose.

Another Secret Service Agent, John P. Jones, testified on direct examination to the circumstances of appellant's arrest and appearance before the United States Commissioner, and to admissions made by appellant on that occasion. Mr. Jones stated that he had made a report to his superior which recited this incident. Again, as in the case of Agent Holmes, the appellant called for the production of this report and once again the Court delivered to counsel all portions of the report which related to the matters testified to by Agent Jones. This time counsel accepted the portion of the report offered and the record does not indicate that he objected to not receiving more. But whether he did or not, it is clear that the action of the Court was correct.

There being no error in the proceedings of the trial the judgment is

Affirmed.