**Malissa Q. JOHNS, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 79–310.**

District of Columbia Court of Appeals.

Argued Nov. 13, 1980.

Decided Aug. 17, 1981.

---

Nicholas D. Dale, Washington, D.C., appointed by this court, for appellant.

Robert Bruce Amidon, Asst. U.S. Atty., Washington, D.C., with whom Charles F.C. Ruff, U.S. Atty., John A. Terry and Thomas J. Tourish, Jr., Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before MACK, FERREN, and PRYOR, Associate Judges.

FERREN, Associate Judge:

A jury convicted appellant, Malissa Q. Johns, who had been indicted for second-degree murder while armed, of the lesser-included offense of voluntary manslaughter while armed. D.C. Code 1973, §§ 22–2405, –3202. Her appeal presents two principal questions.

One is of first impression in this jurisdiction: whether the trial court erred in ruling that if appellant were to take the stand, assert self-defense, and call witnesses to testify about the deceased *victim's* violent character, the government would be allowed to cross-examine appellant about *her own* 1971 arrest for assault with a dangerous weapon, even though she had not ex-

pressly put her own good character in issue. We hold that when a defendant claims self-defense and puts on evidence of the deceased victim's violent character, the defendant does not thereby open the door to prosecution evidence of her own character for violence. The trial court's ruling in the present case therefore was erroneous.

The second question is whether the trial court abused its discretion in ruling that the defense could not introduce grand jury testimony (from an earlier proceeding against the deceased) by two witnesses who had identified the deceased as a murderer. We conclude that because the grand jury testimony was competent, relevant, and not excludible on evidentiary policy grounds, the trial court abused its discretion in excluding it from the trial.

Accordingly, we reverse and remand for a new trial.

### I.

On January 21, 1978, Tyrone E. Simmons died from one five-inch stab wound in the chest. On the same day, appellant went with her father to Sixth District police headquarters and admitted stabbing Simmons. Appellant was immediately arrested, advised of her rights, and strip-searched. Police then took her upstairs to the detective's room where she told them she had stabbed Simmons in self-defense.

The government's case consisted primarily of police-officer testimony that appellant had admitted the stabbing, coupled with testimony by Simmons' companions that he had entered appellant's apartment building, intending to look for his stolen television set in her apartment, and had come out a few minutes later with the fatal wound. The trial court would not permit defense counsel to elicit on cross-examination of the police officers that appellant, after admitting the stabbing, had told them she had acted in self-defense.

The defense presented evidence that the deceased had gone to the apartment where appellant was staying, banged on the door, and said he was "going to kill that bitch." Appellant's father testified that she had told the police, before her arrest, that she had stabbed the deceased after he had attacked her and had threatened her life. Appellant's aunt testified that she had noticed bruises on appellant's face and neck a few hours after the stabbing.[1]

In recognition of the defense right to present evidence bearing on the question whether Simmons or appellant was the more likely aggressor, the trial court permitted appellant to introduce some evidence of Simmons' violent acts toward third persons on other occasions—evidence, for example, that Simmons had punched various women. The court, however, would not permit the defense to introduce grand jury testimony by two persons who had identified Simmons in 1973 as the murderer of another individual in a case where homicide charges eventually had been dropped. Because one of these witnesses had recanted part of his story and the other had failed to attend a lineup in which Simmons appeared, the court concluded that their grand jury testimony was insufficiently reliable for admission into the present case. The court ruled, moreover, that if appellant elected to testify herself and also called witnesses to testify about Simmons' other violent acts, the government could introduce evidence of appellant's own violent character. Specifically, the government would be permitted to cross-examine appellant about her 1971 arrest for assaulting a twelve-year-old girl with a bottle. Appellant did not testify.

The trial court denied defense motions for judgment of acquittal at the end of the government's case and at the conclusion of the trial. The jury convicted appellant of voluntary manslaughter while armed. The court sentenced her to prison for three to nine years but suspended execution of sentence and placed her on four years' super-

---

1. The officer who had conducted the strip search testified that she had seen no injuries to appellant's body.

vised probation. Appellant noted her appeal.

## II.

■ In order to resolve the question whether appellant's effort to bolster her claim of self-defense through evidence of the deceased victim's violent character should permit the government to present evidence of her own violent character, we must consider (A) the trial court's ruling, (B) the relationship of that ruling to appellant's decision not to testify, and (C) the evidentiary policies pertinent to this perplexing question. We conclude that the trial court erred in ruling that if appellant testified and called other witnesses to the deceased victim's violent character, the government could cross-examine appellant about her arrest for a prior assault. We hold that unless a defendant expressly puts her own good character in issue, her introduction of evidence of the deceased victim's violent character to support her claim of self-defense does not permit the prosecution to offer similar evidence about the defendant. We further conclude that the error in this case was not harmless.

A. Twice before trial, defense counsel told the court that appellant intended to testify. At trial, in her opening statement to the jury, defense counsel implied that her client would testify and claim self-defense.[2] Later on the first day of trial during a bench conference, the court inquired, "Is there any question about whether she is *going to be taking the stand?*" Counsel replied, "No, Your Honor."

The next day, defense counsel announced she would call to the stand appellant's brother, Cecil Johns, who had been the government's first witness. Counsel informed the court that she intended to use Mr. Johns as "[a] character witness . . . as to the deceased." At this point, the court brought up the question—raised earlier by the government—whether appellant's presentation of evidence of Simmons' violent character would open the door for the government to introduce similar evidence about appellant.

After a lengthy discussion with counsel, the court ruled that if appellant took the stand in her own defense, testified about Simmons' violent character, but did not call other witnesses to testify about Simmons' earlier acts of violence, the government would not be allowed to cross-examine as to her own prior violent acts; but if appellant testified and also introduced evidence about Simmons' character through other witnesses, the government could "go a certain distance" in putting on evidence of appellant's own violent character.[3] Specifically, the court ruled that if the defense "open[ed] up the question of aggressiveness through other witnesses," the government would be allowed to cross-examine appellant about her 1971 arrest for assaulting a twelve-year-old girl.[4] The court, however, re-

---

2. [DEFENSE COUNSEL]: And you are going to hear evidence that while they were at 930 T Street Mr. Simmons picked up a ladder, and he threw it at Miss Johns. Miss Johns is five foot two and 110 pounds.

   You will hear evidence that Miss Johns defended herself. She did the only thing that she could.

3. The trial court was concerned about the possibility of improperly dissuading appellant from testifying in her own defense. By allowing appellant (but only appellant) to testify as to Simmons' violent character without opening the door for the government to introduce similar evidence concerning appellant, the court "attempt[ed] to strike some balance" between the interests at stake. The court stated:

   [T]he reason I am doing this is because to do otherwise might preclude her from taking the stand. She has the right to take the stand, I am not precluding that. When she takes the stand, she has the right to testify to anything which is relevant, and her testimony as to the aggressiveness of the deceased is relevant, so I am not taking away any rights which she has. But she doesn't have any constitutional right to bringing in other witnesses to testify as to the aggressive qualities of the deceased and preclude the Government from bringing in like evidence regarding her past acts as to violence which would indicate aggressiveness.

4. [DEFENSE COUNSEL]: And so Your Honor's ruling on that is if she does bring [Simmons' past acts of violence] in through other witnesses, Your Honor will permit the Government to cross-examine her about specific prior bad acts that they claim—

served judgment on the government's request to call the complaining witness to the 1971 incident, if necessary, to rebut the testimony of appellant on cross-examination. The court was inclined to the view that such rebuttal evidence would be "precluded by the *Lloyd* case," which limits testimony in rebuttal of a defense character witness to testimony about general reputation (in contrast with evidence of specific incidents, such as the 1971 arrest). *See Lloyd v. United States*, D.C.App., 333 A.2d 387, 390 (1975).

In response to an inquiry from the court, the government stated that it had no evidence, other than the 1971 arrest, concerning the defendant's propensity for violence. Accordingly, the court's rulings implicitly conveyed a third message to defense counsel: if appellant chose *not* to testify, she could introduce testimony by others as to Simmons' violent character without risk that the government could attack her own character through the 1971 arrest or otherwise; for even if third-party testimony about Simmons' violent character properly could serve, as the government contended, to permit rebuttal evidence about appellant's character, the government (in the trial court's view) would be limited to rebuttal with general reputation evidence—evidence which the government acknowledged it did not have.

The trial court, therefore, in effect gave appellant three choices: (1) She could testify as to her own knowledge of Simmons' violent character. If she called no other witnesses on this subject, the government would not be allowed to introduce evidence of her own reputation or prior acts of violence (in this case, the 1971 arrest). (2) She could testify herself and call other witnesses on the subject of Simmons' reputation and prior acts of violence. Election of this option, however, would open the door for the government to cross-examine appellant about her 1971 arrest. (3) She could call other witnesses to testify about Simmons' character but not testify herself. This alternative would preclude the government from introducing evidence of appellant's 1971 arrest.

The course of the trial indicates that appellant elected this third option. Although the defense did not call Cecil Johns (as originally proposed) to testify about Simmons' character, counsel ultimately called Wayne Hartzell for that purpose. Hartzell testified that he had seen Simmons punch various women, including appellant, on several occasions. Defense counsel also attempted, unsuccessfully, to have Hartzell testify as to Simmons' (bad) reputation in the community. *See* note 13 *infra*. Appellant did not testify. Consequently, the government did not have an opportunity to introduce evidence of her own violent character, namely the 1971 arrest.

B. We turn to the relationship between the trial court's ruling and appellant's decision not to testify.[5]

The implication is strong that appellant changed her mind about testifying because of the court's ruling that third-party witnesses to Simmons' reputation and prior acts of violence would open the door to cross-examination about her own 1971 arrest for assault. We do not find persuasive the government's argument that the causal relationship between the court's ruling and appellant's decision not to testify amounts to "speculative hindsight." The government itself urged the trial court to frame

THE COURT: The one that [the prosecutor] mentioned.
[DEFENSE COUNSEL]: Will permit the Government to cross-examine her about that incident, is that right?
THE COURT: Yes. What's your move? Who is your next witness?
[DEFENSE COUNSEL]: Instead I think I will call Ms. Aluveller Johnson next.

5. Normally, we first would scrutinize for error and then determine whether any error was harmless for lack of sufficient causal connection to the decision not to testify (or for any other reason). Here, however, we reverse the order of analysis because harmlessness, based on absence of a causal connection, could be determinative—as our dissenting colleague concludes—and thus, in the interest of judicial economy, obviate the need for analysis of a complex question of first impression.

the choice: either limit evidence of Simmons' bad character to appellant's own testimony, or subject appellant, if she testified, to similar questioning about her own character. Having succeeded in pressing this choice on appellant, the government is not in a strong position to claim that appellant chose to remain off the stand for other, unrelated reasons.

In any event, the record suggests no other persuasive reason why appellant may have changed her mind about testifying. For example, the last time defense counsel confirmed to the trial court, unequivocally, that her client would testify, counsel did so knowing that the government intended to impeach appellant with two prior convictions (neither one for a crime of violence). It is impossible, of course, for appellant to demonstrate that for this reason alone, and no other, she declined to testify; but the course of the trial indicates a sufficient causal link between the court's ruling and appellant's decision that the ruling must be scrutinized for possible error. The record does not reflect other reasons for appellant's declining to testify sufficient to call the trial court's rulings—if error—harmless.[6]

C. The question whether a defendant opens the door to evidence of her own character by presenting evidence of the deceased victim's character lies at the intersection of several other rules of evidence. This particular evidentiary question is difficult because these other rules, while not inconsistent with each other, serve different evidentiary goals which would lead to different answers here. Accordingly, our decision depends on which evidentiary goal demands priority in the situation presented by this case.

■ We begin with a fundamental rule of policy: the prosecution may not present evidence of the defendant's (bad) character, in order to show likelihood of committing a crime, unless the defendant first places her own (good) character in issue. E.g., Michelson v. United States, 335 U.S. 469, 475–79, 69 S.Ct. 213, 218–20, 93 L.Ed. 168 (1948); E. Cleary, McCormick's Evidence § 191, at 454 (2d ed. 1972 & Supp. 1978); 1 C. Torcia, Wharton's Criminal Evidence § 229, at 489 (13th ed. 1972 & Supp. 1981). More specifically, the government cannot rebut a testifying defendant with evidence of her bad character (including general reputation and specific acts) unless the defendant herself has introduced good character evidence, as such; a defendant does not place her character in issue merely by taking the stand as a witness. United States v. Tomaiolo, 249 F.2d 683, 689 (2d Cir. 1957); McCormick, supra § 191, at 454–55; 1 Wharton's Criminal Evidence, supra § 229, at 489–93. The reason for this rule is not that character is irrelevant; it is, rather, that the jury may put too much weight on such evidence so "as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." Michelson, supra 335 U.S. at 476, 69 S.Ct. at 218; see McCormick, supra § 191, at 454; 1 J. Wigmore, Evidence § 57, at 456 (3d ed. 1940 & Supp. 1980).[7]

■ The second rule is a rule of relevance: at least when a defendant is charged with homicide, she has the right to present evidence of the victim's violent character to support a claim of self-defense. United States v. Akers, D.C.App., 374 A.2d 874, 877 (1977); Hurt v. United States, D.C. App., 337 A.2d 215, 217 (1975) (per curiam); King v. United States, D.C.App., 177 A.2d 912, 913 (1962); United States v. Burks, 152 U.S.App.D.C. 284, 286, 470 F.2d 432, 434 (1972); Evans v. United States, 107 U.S.

---

**6.** It is enough for appellant to demonstrate that the ruling contributed to her decision; she need not prove it was the "sole reason," as our dissenting colleague maintains. *Post* at 475–476. The fact that other reasons may have contributed to the decision cannot erase the causal, and thus prejudicial, impact of the ruling.

**7.** According to Wigmore:

The deep tendency of human nature to punish, not because our victim is guilty this time, but because he is a bad man and may as well be condemned now that he is caught, is a tendency which cannot fail to operate with any jury, in or out of Court. [1 Wigmore, *supra* § 57, at 456.]

App.D.C. 324, 325, 277 F.2d 354, 355 (1960); *Griffin v. United States*, 87 U.S.App.D.C. 172, 174, 183 F.2d 990, 992 (1950); 1 Wharton's Criminal Evidence, *supra* § 236. Evidence of violent character may be testimony about specific acts, *see Clark v. United States*, D.C.App., 412 A.2d 21, 26 (1980) (threats); *Griffin, supra* 87 U.S.App.D.C. at 174, 183 F.2d at 992 (same), including acts of violence unrelated to the crime at issue. *See King, supra* at 913 (complaining witness involved in two other fights with fellow workers); *Burks, supra* 152 U.S.App.D.C. at 286, 470 F.2d at 434 (deceased had killed his six-year-old son). Or it may be evidence of general reputation for violence. *See King, supra* at 913; *Evans, supra* 107 U.S.App. D.C. at 325 & n.2, 277 F.2d at 355 & n.2.

Such evidence may be relevant to the two basic self-defense issues: (1) the objective question who was the aggressor, and (2) the subjective evaluation of the defendant's state of mind: whether she was in reasonable fear of imminent great bodily injury. *Burks, supra* 152 U.S.App.D.C. at 286 & n.4—287 & n.5, 470 F.2d at 434 & n.4—435 & n.5; Note, *Character Evidence—The Rules of Admissibility in Criminal Cases in Kentucky*, 61 Ky.L.J. 963, 969–70 (1973); 99 U.Pa.L.Rev. 105, 105 (1950). As to the first issue, evidence of the deceased's violent character is relevant whether the defendant knew about it or not.[8] As to the second issue, however, focusing on the extent of defendant's fear, such evidence will be relevant only if she knew about the victim's violent character at the time of the crime. *See King, supra* at 913.

Finally, there is a rule of evidential parity: once the defendant opens the door to a specific issue, the government has the right to respond with contrary evidence on the same issue. Thus, as we noted, if a defendant introduces evidence of her own good character, the government can rebut with evidence of her bad character. Similarly, when a defendant introduces evidence of the victim's violent character (whether known to defendant or not) to demonstrate that the deceased was the more likely aggressor, she opens the door for government rebuttal with evidence of the victim's peaceable character. 1 Wharton's Criminal Evidence, *supra* § 236. The rebuttal in each case goes directly to offset the defendant's proffer of evidence.

D. Although these rules of evidence are familiar as independent propositions, no court in this jurisdiction has considered whether, taking these rules together, defense-proffered evidence of a deceased *victim's* violent character opens the door for government rebuttal evidence against the *defendant's* character—including cross-examination of the defendant herself as to prior acts of violence—on the theory that such rebuttal is germane to the first issue addressed by evidence of the victim's character: the more likely aggressor.

The authority on this question is sparse; we have found few cases that deal squarely with it. In *State v. Robinson*, 344 Mo. 1094, 130 S.W.2d 530 (1939), the court held, in a homicide case, that "where an accused tenders the factual issue of the bad character of the victim of his assault to substantiate his plea of self-defense," he thereby opens the inquiry to "all evidence of like quality having probative value" on the issue of self-defense, including evidence of the accused's own character. *Id.* at 1097, 130 S.W.2d at 532; *accord, State v. Page*, 577 S.W.2d 177, 178–79 (Mo.App.1979). Wigmore favors the parity of this "Missouri"

---

8. In *Akers, supra* at 877, we stated that when the defendant did not know about victim's violent character at the time of the altercation, admissibility of evidence of the victim's prior bad acts "is limited to homicide cases." However, in *Cooper v. United States*, D.C.App., 353 A.2d 696, 700 n.8 (1976), we indicated that evidence of the victim's general reputation for violence, in contrast with specific acts, would be admissible when the defendant asserted self-defense in an assault or homicide prosecution, even though the defendant was unaware of that reputation. Moreover, the cases on which both *Akers, supra*, and *Cooper, supra*, relied, although they involved homicides, did not premise admissibility of such evidence—general reputation or specific acts—on homicide; the rule extended to all assaults. *See Burks, supra* 152 U.S.App.D.C. at 286, 470 F.2d at 434; *Evans, supra* 107 U.S.App.D.C. at 325, 277 F.2d at 355; *Griffin, supra* 87 U.S.App.D.C. at 174, 183 F.2d at 992.

approach. *See* 1 Wigmore, *supra* § 63, at 472 & n.4; 99 U.Pa.L.Rev., *supra* at 107.[9]

Wright and Graham (citing unconvincing authority) say that "the common law rule, except in a few states, was apparently to the contrary" of the Missouri rule. 22 C. Wright & K. Graham, Federal Practice & Procedure § 5237, at 406 (1978). Two states, in any event, clearly have rejected the Missouri approach. In *Roberson v. State*, 91 Okl.Cr. 217, 218 P.2d 414 (1950), the court held that the rule barring evidence of the defendant's character is absolute (unless she makes an issue of it), primarily because of a fear that such evidence, unrelated to the crime at issue, would give the accused too much to defend against, without adequate notice, and thus "in many instances, [would] provoke the conviction of the accused on general principles instead of on the issues involved in the particular case." *Id.* at 234, 218 P.2d at 422. Recently, in *Keith v. State*, 612 P.2d 977 (Alaska 1980), the Alaska Supreme Court held that a state rule of evidence, following Fed.R. Evid. 404(a), "does not suggest that proof of the character of the victim and the accused are interrelated. An accused may offer evidence of a relevant character trait of a victim without its having the effect of granting to the prosecution the right to introduce evidence of his own character." *Id.* at 984–85.[10]

This split of authority places us in a position not of applying a traditional rule but of electing and announcing what the rule in this jurisdiction shall be.

If the only self-defense issue were the objective question of who was the aggressor, there would be force to the argument that a rule of parity should prevail. Some authorities have reasoned that a defendant who introduces evidence of the victim's violent character cannot complain about the government's desire to introduce equally relevant evidence about the defendant herself. *See Robinson, supra* 344 Mo. at 1097, 130 S.W.2d at 531; *Roberson, supra* 91 Okl.Cr. at 273, 218 P.2d at 439 (Powell, J., dissenting); note 9 *supra.* Evidence of the deceased's character, however, is relevant not only to the objective question who was the aggressor, but also—if the defendant knew of that character—to the potentially more central aspect of the claim of self-defense: the subjective question whether defendant was in reasonable fear of imminent great bodily injury. In contrast, evidence in rebuttal by the government as to the violent character of the defendant properly could go only to the aggressor issue, for it would be irrelevant to the defendant's fear of the deceased.[11]

Accordingly, if the defendant were to testify that she reacted in self-defense out of fear partially based on knowledge of the deceased's violent character—and if the government were allowed to rebut that claim with evidence of the defendant's own acts of violence—the jury, even if properly instructed, would have to perform mental gymnastics to limit the government's rebut-

**9.** One commentator has elaborated:
> [T]he issue involved is not "Would victim precipitate a deadly contest?" but "Did defendant or did victim precipitate this particular deadly contest?" Evidence of the victim's turbulent character is of probative force, then, only if the inference can be drawn that the victim was more likely the aggressor than defendant. This can be inferred only when defendant's character is also taken into consideration, for if it is known that defendant too was a man of violent character, then the probabilities as readily favor the inference that the defendant was the aggressor as that the victim was the aggressor. [99 U.Pa.L. Rev., *supra* at 107.]

**10.** The issue of reciprocal use of character evidence would not arise if the defense could introduce evidence of the victim's violent charac-

ter only if known to the defendant, in order to show the defendant's subjective fear, and could not introduce such evidence (whether known or unknown to the defendant) to show the victim was the more likely aggressor. *See State v. Padula*, 106 Conn. 454, 456–59, 138 A. 456, 457–58 (1927), *overruled, State v. Miranda*, 176 Conn. 107, 110, 405 A.2d 622, 623–24 (1978); *People v. Rodawald*, 177 N.Y. 408, 422–24, 70 N.E. 1, 5–6 (1904). *See generally* 99 U.Pa.L. Rev., *supra* at 106–07. This jurisdiction long since has resolved this threshold question to the contrary.

**11.** It would be too attenuated an argument to say evidence of a defendant's reputation for violence indicates a tendency not to fear another person.

tal to the aggressor issue, and not to relate evidence of the defendant's violent character to the defendant's subjective fear. We believe that the tendency inevitably would be for the jury to use evidence of the defendant's previous violence to offset the claim of self-defense without regard to its separate aspects.[12]

It would be possible, of course, if the defendant introduced evidence of the deceased's violent character, for the government then to argue that the defendant did not know about the deceased's violent character at the time of the fatal incident and, accordingly, that the evidence was not relevant to the defendant's subjective fear. The government then could argue that rebuttal evidence about the defendant's violent character would relate only to the aggressor issue, and thus should be admitted subject to a jury instruction limiting its use to that purpose. Even if we were to agree that under these circumstances the jury could follow such an instruction, compare notes 10, 12 supra, there still might be the need for a virtual trial within a trial to determine what the defendant did or did not know about the deceased, before the court could rule on the government's request. The result might be a judicial determination (solely for purposes of admitting evidence) that the defendant did not know of the deceased's violent past; and yet, if the defense nonetheless introduced some evidence to the contrary, the jury would have to be told it ultimately should decide the question of the defendant's knowledge in evaluating the nature and extent of the defendant's fear—and then apply the government rebuttal evidence only to the proper, "aggressor" aspect of the self-defense claim. The matter would become even more complicated for judge and jury if there were several violent acts of the deceased, each of which raised a question whether the defendant had or had not known about it.

■ We conclude, accordingly, that whether a defendant or some other defense witness testifies about the deceased victim's violent character for its relevance to the "reasonable fear" and/or "aggressor" aspects of a self-defense claim, the general rule of policy against admission of evidence about the defendant's own character shall prevail, unless, of course, the defendant first places her own (good) character in issue. A more precise rule of parity, while theoretically appealing, would be unworkable in practice.[13]

■ The trial court, therefore, erred in ruling that the government could cross-examine appellant about her 1971 arrest if, in addition to testifying herself, she called witnesses to testify about Simmons' reputation and prior acts of violence.

The government urges, however, that any error here was harmless. We cannot agree. We already have noted the causal connection between the court's ruling on appellant's decision not to testify. See Part II.B. supra. In a case where the only persons present at a homicide were the deceased and the accused, an erroneous evidentiary

12. By contrast, in jurisdictions where evidence of the victim's violent character is limited to evidence known to the defendant at the time of the altercation and is admissible only on the issue of the defendant's fear, see note 10 supra, the court easily may instruct the jury that it cannot consider such evidence for any other purpose, such as the "aggressor" issue.

13. We recognize that our analysis relies principally on the problem of limiting government rebuttal evidence to the aggressor issue in cases where a defendant has introduced evidence of the deceased's violent character, known to the defendant, primarily to show the defendant's own fear—an issue on which the government's rebuttal evidence about the defendant's character would be irrelevant. Arguably, therefore, if it is undisputed that a defendant did not know of the deceased's violent character at the time of the incident, parity considerations should permit government rebuttal with evidence of the defendant's own violent character. We decline to leave open this possibility, however, because while the number of instances where the defendant's lack of knowledge is truly unquestioned would be few, leaving open an exception to the rule would invite prolonged, distracting disputes over what the defendant did or did not know in far too many cases. A uniform rule is preferable to one that would be substantially fact-oriented and thus difficult to apply.

ruling with that consequence cannot be harmless.[14]

### III.

The second issue on appeal is considerably more straightforward: whether the trial court erred in excluding a transcript of testimony by two witnesses about the decedent's prior violent acts, taken from a previous grand jury proceeding against the decedent. We conclude that the trial court abused its discretion in this ruling.

A. In an effort to establish that Simmons had been the aggressor, appellant sought to introduce a transcript of 1973 grand jury testimony of two persons, Catherine Wells and Melvin Holt, who had identified Simmons as the person who on another occasion had beaten a man to death with a stick. According to defense counsel's proffer, appellant "plan[ned] to introduce this for the purpose of showing that Tyrone Simmons was more likely the aggressor."

During a colloquy before trial, the prosecutor told the court that Wells had affirmed to the grand jury a statement she previously had given to the police.[15] Wells had told the police that Brenda Kimbrough reportedly had assaulted Simmons' father; that later the same day, Simmons had sought out Kimbrough and "started hitting Brenda Kimbrough with the stick"; that Wells briefly had gone "back into the dining room to get somebody to break up the fight"; and that when she returned she "saw John Chambers lying on the floor and he was beating him with the stick." In context, according to the prosecutor, the United States Attorney's office took this testimony to mean "that Mr. Simmons was beating Brenda Kimbrough and that Mr. Chambers

interceded and then he [Simmons] beat Mr. Chambers to death." After giving her statement to the police, Wells identified Simmons in a photo array: "I think this is him, the guy with the stick."

The prosecutor did not read portions of Holt's grand jury testimony to the court. However, he stated (in reference to Holt) that "the witness had identified Mr. Simmons as the murderer in a photographic array." In addition, he read Wells' response to the question whether Simmons' companion had helped beat Chambers: "Melvin [Holt] said that they were switching up with the stick. I [Wells] didn't see him strike Chambers. Most of the fight happened while I was getting Richardson" in the dining room to help break up the fight.

The grand jury had indicted Simmons for first-degree murder, but eventually the United States Attorney had dismissed the case. After her initial photo identification, Wells had failed to appear at a lineup. Holt partially had recanted his photo identification, stating before the grand jury, "Well, yeah, I identified him in the photo but I wasn't really sure," and also had failed to identify Simmons at a lineup.

Stressing that Wells not only had failed to appear at the lineup, but in response to the photo array had said merely "I think" Simmons was "the guy with the stick," the prosecutor asked the court to exclude her grand jury testimony; it "just lacks any substantial probative value." Similarly, he urged the court to reject Holt's testimony because of Holt's eventual recantation.

The court accepted the prosecutor's argument, ruling that the proffered grand jury testimony was not positive enough:

---

14. The impact of a ruling that causes a defendant *not to testify* arguably has a constitutional dimension, requiring harmlessness beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). We do not resolve that question; we cannot find the error here harmless even under the lesser standard of *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

15. All the quotations are from the prosecutor's reading of Wells' statement to the court. The prosecutor had permitted defense counsel to see the grand jury testimony (and related statements to the police) but declined to turn over a copy or to file it with the record on appeal. Because of our conclusion below that the grand jury testimony is admissible in this case, the government should furnish defense counsel with the relevant portions. *See Brady v. Maryland*, 373 U.S. 83, 85, 87, 83 S.Ct. 1194, 1195, 1196, 10 L.Ed.2d 215 (1963).

THE COURT: I'm not going to rule on it right now, but my present thinking is, and I have an open mind on it, that if one of those witnesses at the Grand Jury did, in fact, testify that Simmons assaulted somebody and if those witnesses are unavailable, I think that the Grand Jury testimony would be admissible. The problem I'm having with it at the moment is that we don't have any, I'm not sure we have testimony to that effect. And we have testimony to the effect that, not that he did, but that he may have or I think he's the person who did. That gives me a little trouble.

\*    \*    \*    \*    \*    \*

THE COURT: Well, we can go on this all day long. I think I indicated Friday and I will say it again today, that the mere fact that you have a transcript of the Grand Jury or what have you where somebody says, "I think so and so committed an offense," that is not enough.

B. In determining the admissibility of evidence, the trial court must take three intellectual steps: (1) the evidence must be competent; (2) it must be relevant; and (3) even though relevant, the evidence should not be admitted if certain countervailing circumstances outweigh probative value, *e. g.,* prejudice, confusion of the issues, cumulative testimony, undue delay. *See generally* 1 S. Gard, Jones on Evidence §§ 1.4, 4.6 (6th ed. 1972 & Supp.1980); 1 Wharton's Criminal Evidence, *supra* §§ 151, 152, 154. Although the trial court has substantial discretion in making these determinations, the court must be careful not to confuse them with the "credibility and weight to be assigned to competent and admissible testimony." *Fowel v. Wood,* D.C.Mun.App., 62 A.2d 636, 637 (1948). It is for the jury to decide weight and credibility; "neither the trial court nor the reviewing court can infringe upon that authority." *Norcott v. United States,* 65 F.2d 913, 919 (7th Cir.), *cert. denied,* 290 U.S. 694, 54 S.Ct. 130, 78 L.Ed. 597 (1933); *accord, Scott v. O'Brien,* 129 Ky. 1, 11–12, 110 S.W. 260, 263 (1908); *Baker v. State,* 86 Neb. 775, 777–78, 126 N.W. 300, 301 (1910); 1 Wharton's Criminal Evidence, *supra* § 151, at 278; 22 C. Wright & K. Graham, *supra* § 5165, at 51–52 ("The judge cannot make decisions as to the weight of the evidence under the guise of determining relevance."); 75 Am. Jur.2d *Trial* § 126 (1974 & Supp.1980).

█  In this case, we conclude that the trial court impermissibly invaded the province of the jury in excluding the grand jury testimony. In the first place, the grand jury testimony was competent: it passed a threshold test for reliability focusing on the source of the evidence. *See* 1 Wharton's Criminal Evidence, *supra* § 154. Although hearsay—absent an applicable exception—is considered too unreliable to constitute competent evidence, *see id.,* hearsay is deemed competent when other indicia of reliability make up for the absence of live testimony. In the present case, the grand jury testimony came within the hearsay exception for prior recorded testimony.[16] Thus, the threshold question of competency is met here.

Second, the grand jury testimony was relevant to a material issue. Simmons' violent character was material to appellant's claim that Simmons had been the aggressor and that appellant accordingly acted in self-

---

**16.** Prior recorded testimony can be admitted as an exception to the hearsay rule when: "(1) the direct testimony of the declarant is unavailable, (2) the former testimony was given under oath or affirmation in a legal proceeding, (3) the issues in the two proceedings were substantially the same, and (4) the party against whom the testimony now is offered had the opportunity to cross-examine the declarant at the former proceeding." *Alston v. United States,* D.C. App., 383 A.2d 307, 315 (1978); *see Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 2542–43, 2545, 65 L.Ed.2d 597 (1980); *Jackson v. United States,* D.C.App., 424 A.2d 40, 42 (1980). The government questions only whether Wells was "unavailable" (Holt concededly was dead). Defense counsel repeatedly stated that she had made diligent efforts to obtain both witnesses and the government at no time prior to this appeal challenged the sufficiency of these efforts. Having failed to raise this issue in the trial court, the government cannot properly raise it here. *See Miller v. Avirom,* 127 U.S. App.D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967).

defense. Competent evidence tending to show that the deceased himself had killed another person was unquestionably relevant to this issue.

Third, although the trial court has substantial discretion to exclude even relevant evidence when certain countervailing circumstances outweigh its probative value, no such circumstances are present here. *See generally* 1 Jones on Evidence, *supra* § 4:6; 1 Wharton's Criminal Evidence, *supra* § 151; 22 C. Wright & K. Graham, *supra* §§ 5215–22. The government's arguments to the contrary are unpersuasive. The government contends, initially, that the grand jury testimony was only "circumstantial, in that it could only have placed [Simmons] on the scene of Mr. Chambers' beating." As a result, the government says, the grand jury testimony would have sidetracked the jury on a collateral issue and thus caused unnecessary confusion. This argument, however, is inconsistent with the government's own proffer, for the prosecutor told the court that he interpreted the testimony to mean that the witness had seen Simmons beating John Chambers to death with a stick. That testimony, if believed, did much more than place Simmons at Chambers' beating. If the jury interpreted it the same way the prosecutor himself did, the testimony labeled Simmons as a murderer.[17] Because appellant claimed self-defense, the deceased's past violent conduct was not a collateral issue.

Next, the government maintains that the proffered evidence was cumulative on the aggressor issue and therefore properly was excluded. It is true that the number of witnesses to the deceased's violent character "can be controlled in the trial court's discretion so as to limit cumulative testimony." *Hurt, supra* at 217. Here, however, the evidence identifying Simmons as a murderer was of far greater magnitude than

the other testimony appellant was able to produce showing Simmons' propensity for violence, namely, that Simmons once had chased appellant with a stick and had struck another woman. We therefore cannot accept the government's argument that the evidence was cumulative and that any error in its exclusion harmless.[18]

Finally, the government maintains that the uncertainty implied by the grand jury witnesses, combined with their conduct following the grand jury hearing (namely, their failure to appear at lineups and Holt's partial recantation) rendered their grand jury testimony too unreliable for admission into evidence. The trial court apparently relied substantially on this rationale. Although the credibility of the evidence before the grand jury was certainly open to question, that question was for the jury to decide. That one witness said "I think" Simmons was "the guy with the stick" instead of, simply, "Simmons was the guy with the stick" does not render her testimony inadmissible. Again, the question of the competency must be distinguished from the question of credibility and weight:

[W]hen a witness uses such expressions as "I think," "My impression is," or "In my opinion," this will be no ground of objection if it appears that he merely speaks from an inattentive observation, or an unsure memory, though it will if the expressions are found to mean that he speaks from conjecture or from hearsay.

McCormick on Evidence, *supra* § 11, at 21–22 (footnotes omitted). Here, the grand jury witnesses had testified to their direct observations. Their possible lack of certainty was no basis for exclusion.

Because the grand jury testimony was competent, relevant, and not excludible on evidentiary policy grounds, the trial court abused its discretion in excluding it from the trial. *See Johnson v. United States,*

17. The government's eventual dismissal of the indictment reflects on the credibility of the testimony, not on its competency or relevance.

18. The court, moreover, excluded the grand jury testimony in a pretrial ruling. This posture further weakens the government's argu-

ment that the court properly could have excluded the evidence as cumulative. At the point of the ruling, the defense had not introduced any evidence at all going to Simmons' violent character. *See generally* Annot., 17 A.L.R.3d 327 (1968 & Supp.1980).

D.C.App., 398 A.2d 354, 365–67 (1979). The government, of course, has a right to discredit it before the jury through evidence of the sort the trial court relied on to keep the testimony out of the case.

Because we agree with two assignments of error, we must reverse appellant's conviction and remand for a new trial.[19]

*Reversed and remanded.*

PRYOR, Associate Judge, dissenting:

During the course of a trial where appellant raised the defense of self-defense to a charge of second-degree murder while armed, the government announced its intention to cross-examine the accused about circumstances surrounding an earlier *arrest* for assault with a dangerous weapon. The government's explicit position was that this evidence was admissible in parallel fashion as would be so in instances of prior bad acts attributable to the decedent. The court accepted the prosecutor's rationale and indicated that such examination would be allowed.

It was also clear that if appellant elected to testify, she would have been questioned by the government regarding earlier statements inconsistent with her purported trial testimony, as well as two prior criminal convictions.

Appellant chose not to testify. Even from the vantage point of hindsight, the reasons for appellant's decision not to testify are not precisely discernible. Aside from appellant's own evaluation of the strength or weakness of the government's evidence, there were also factors of impeachment on the basis of criminal convictions and earlier inconsistent statements. Lastly, there was the judge's ruling as to her prior violent behavior. I cannot conclude that this last factor was the sole reason for appellant not testifying. To go further and hold that this nontestimony substantially affected the fairness of the trial and, therefore, consti-

**19.** As to the third assignment of error, the determination whether a witness is qualified to testify about reputation is left to the sound discretion of the trial judge. *See Gage v. United States,* 167 F.2d 122, 125 (9th Cir. 1948); *People v. Workman,* 136 Cal.App.2d 898, 901, 289 P.2d 514, 515 (1955); 1 Wharton's Criminal Evidence, *supra* § 230, at 499. There was no abuse of discretion here, for Wayne Hartzell's knowledge of Simmons' reputation was limited to the opinions of one family and of three other individuals whose opinions he had received several years before Simmons was killed. *See Gage, supra* at 125; *Workman, supra* at 136 Cal.App.2d 901, 289 P.2d at 515.

As to the fourth alleged error, we conclude—and the government does not contest—that appellant's admission that she had stabbed the deceased, followed by her claim of self-defense, was a continuous though interrupted statement at the police station. Appellant was entitled to have this entire statement put into evidence. *See United States v. Wenzel,* 311 F.2d 164, 168 (4th Cir. 1962) (quoting 20 Am.Jur. *Evidence* § 488, at 425 (1939)); *Hoover v. Beto,* 467 F.2d 516, 529 (5th Cir.) (en banc) (citing 2 Wharton's Criminal Evidence § 361 (12th ed. 1955)), *cert. denied,* 409 U.S. 1086, 93 S.Ct. 703, 34 L.Ed.2d 673 (1972); *Whitten v. State,* 222 Ark. 426, 427, 261 S.W.2d 1, 2 (1953); *Davis v. State,* 230 Miss. 183, 188–89, 92 So.2d 359, 361 (1957); *Westbrook v. State,* 522 S.W.2d 912, 915 (Tex.Cr.App.1975). Courts usually allow the defense on cross-examination to introduce the complete statement, in order to clarify the partial statement admitted on direct examination. *See Hicks v. United States,* 127 U.S.App. D.C. 209, 214, 382 F.2d 158, 163 (1967); *Whitten, supra* at 427, 261 S.W.2d at 2; *Davis, supra* at 188, 92 So.2d at 361; *Westbrook, supra* at 915. It is conceivable, however, that in some cases, the trial court properly could rule that the defense should wait to introduce the omitted portion as part of its own case, provided, of course, that the defense could recall the government witnesses (who initially testified) as though on cross-examination. Because the record is unclear as to whether the trial court's ruling was limited to preventing the introduction of the omitted portion during the government's case and because there are independent grounds for reversal, we decline to speculate as to whether it would have been permissible for the trial court to control the order of proof in this manner.

Finally, there was sufficient evidence for a reasonable juror to find guilt beyond a reasonable doubt, *see Byrd v. United States,* D.C.App., 388 A.2d 1225, 1229 (1978); *Curley v. United States,* 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947), even though the evidence was wholly circumstantial. *See United States v. Harris,* 140 U.S.App.D.C. 270, 284–85, 435 F.2d 74, 88–89 (1970), *cert. denied,* 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 152 (1971). Accordingly, the trial court properly denied appellant's motions for judgment of acquittal.

tuted reversible error is, in my view, unsound.

A second issue which is presented involves appellant's proffer of the grand jury testimony of two witnesses—claimed to be unavailable—to an unrelated homicide as bearing on the decedent's prior violent behavior. The purported identification of the decedent as a wrongdoer in the other death was unclear. One of the two witnesses testified before the grand jury, "Well, yeah I identified him [the decedent here] in the photo but I wasn't really sure." Later the same person failed to make an identification at a lineup. The second witness was similarly uncertain.

The trial court accepted the premise that evidence of prior assaultive behavior of the decedent was admissible. The problem in this instance was, at a minimum, whether the evidence, in the form that it was available (grand jury minutes and police reports), was presentable to the trial jury in a manner that would not be confusing.

> THE COURT: We are not going to have [to go] to trial here to determine whether [decedent] was involved in assaultive behavior in the past. If there's evidence that he was, it's admissible. If we have to hear all of these witnesses and go through a trial, in effect, to determine whether he was, then it's not going to be admitted.

I agree that the witness' choice of words in making an identification normally goes to the weight of the evidence. Cross-examination will generally resolve such ambiguities. In this instance, there were no witnesses to examine. Given the clear prospect of confusion which was evoked, the discretion to exclude such evidence is entrusted to the trial judge. The majority's solution, *ante* at 475,—"The government, of course, has a right to discredit it [grand jury minutes] before the jury through evidence of the sort the trial court relied on to keep the testimony out of the case"—is no answer. Rather, it simply encourages more confusion.

I see no abuse of discretion and certainly not reversible error stemming from the exclusion of an uncertain proffer on a cumulative subject.

Accordingly I dissent.