**Michael R. HOCKMAN, Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 79–1006, 85–722.

District of Columbia Court of Appeals.

Argued June 11, 1986.
Decided Nov. 4, 1986.

---

Mark Rochon, Public Defender Service, with whom James Klein, Public Defender Service, was on brief, for appellant.

Mary A. Incontro, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., were on brief, for appellee.

Before NEBEKER, FERREN, and ROGERS, Associate Judges.

ROGERS, Associate Judge:

Appellant Michael Hockman challenges the denial of his motion to vacate sentence and set aside judgment and for new trial based on the ineffective assistance of his trial counsel, D.C.Code § 23–110 (1981).[1]

---

1. Hockman was indicted for premeditated first degree murder while armed, D.C.Code §§ 22–2401, –3202 (1981), carrying a pistol without a license, *id.* § 22–3204, and carrying a dangerous weapon (knife), *id.* § 22–3204, in connection with the fatal assault on Barry Rivera on October 25, 1977. A jury found him guilty of second degree murder while armed, D.C.Code §§ 22–

He contends he was denied his Sixth Amendment right to the effective assistance of counsel because errors by his trial counsel adversely affected what could have been a compelling self-defense case, and consequently the trial cannot be relied upon as having produced a just result. Specifically, Hockman points to his trial counsel's failures (1) to move to suppress his statement to the police and the murder weapons; (2) to understand the law of self-defense and character testimony; and (3) to investigate the case properly. He also claims the trial court erred in denying his § 23-110 motion without a hearing. We reverse and remand because the trial court denied the motion without holding a hearing to determine whether a motion to suppress would have been granted, and if so, whether Hockman would have testified at his trial. Had Hockman not testified, trial counsel's deficiencies with respect to character testimony and investigation would become more serious, and we would be unable to conclude that but for counsel's errors the result of the trial would not have been different.

## I

On October 25, 1977, Barry Rivera, age 24, was found lying on the corner of Fifth and LeBaum Street, S.E., suffering from gunshot and stab wounds from which he died eighteen days later. Hockman, who had met Rivera through Jackie Godwin, his girlfriend, was questioned at the homicide office early the next morning and was arrested on a charge of assault with intent to kill.

At trial, the government introduced evidence that Rivera had been raised by his grandmother and had lived for most of his life in the neighborhood where he was killed. When he reached the age of eighteen he enlisted in the Marines and served in Vietnam. After returning from military service, he experienced personal difficulties and his behavior became markedly different. He was forced to leave his grandmother's house due to her financial problems and poor health, and thereafter he drifted from place to place. He also spent a lot of time around his grandmother's home, ringing the doorbell, breaking a window, throwing rocks at the house, and attempting to gain entry. As a result, he was arrested three times and convicted of unlawful entry. On one occasion the police took him to Saint Elizabeth's Hospital, but he was released shortly thereafter.

Rivera also began harassing the Godwins, a family he had known from his neighborhood for many years. Approximately three weeks before he was stabbed and shot, Rivera visited the Godwin home for the first time since his return from Vietnam. While there he went into a bedroom where Jackie Godwin was sleeping and began to undress, dropping his pants. Dorothy Godwin, Jackie's mother, found him as he was about to pull down Jackie's bed covers, and ordered him out of the house. Dorothy Godwin testified that Rivera returned the next day, and that "he was so changed. I was really scared of him." Two days later, Rivera returned and refused to leave; Jackie Godwin had to call the police.

Three or four days afterwards, Rivera reappeared at the Godwin house. Jackie Godwin telephoned Hockman and asked him to come over to ask Rivera to leave. Hockman came to the Godwin house and

2403, -3202 (1981), carrying a pistol without a license, and carrying a dangerous weapon. Thereafter, in a separate trial before the court, he raised the defense of insanity. He was sentenced under the Federal Youth Corrections Act, 18 U.S.C. § 5010(c) (1982), to ten years on the murder charge and received concurrent indeterminate terms under *id.* § 5010(b) for the weapons convictions. Trial counsel filed a notice of appeal, contending that the verdict was against the weight of the evidence, and new counsel was appointed. New counsel filed an appeal, but subsequently filed a motion to withdraw from the case. Present counsel was appointed and, following a stay of the direct appeal, counsel filed a motion to vacate and set aside judgment under D.C.Code § 23-110. It is from the denial of this motion without a hearing, which has been consolidated with the direct appeal of the conviction, that Hockman now appeals.

when he asked Rivera to leave, the two began arguing; Rivera shrugged off his coat as if to fight, and then pushed Hockman against a fence. Jackie Godwin called the police. When Officer Shaw arrived, Rivera claimed Hockman had a knife. Shaw watched Hockman walk toward a large trash dumpster not far from the Godwin house, and when he returned, Shaw asked him if he had a knife. Hockman showed Shaw an empty black casing for a knife, and Shaw told him what Rivera had said. Hockman said that if he caught Rivera "messing around with [his] girl again, [he] was going to fuck [him] up." Shaw told Hockman that if anything were to happen to Rivera, he would look for him.

On October 25, 1977, Jackie Godwin met Hockman at about 8:00 p.m. at work. On their way to her house, they stopped to buy beer, and upon seeing Rivera, gave him a bottle. Rivera followed them home and sat on the Godwin porch. Hockman and Dorothy Godwin told Rivera to leave. When Hockman left the house at 10:30 p.m., Rivera was sitting on the curb across the street. Jackie and Dorothy Godwin testified that he was hollering "I hate everybody." Hockman went back into the Godwin's house and took one of Dorothy Godwin's butcher knives.

There were no eyewitnesses to what happened next, until the time Rivera's body was found, and the government introduced Hockman's written statement to the police. The statement was read to the jury. In it Hockman claimed Rivera had punched him in the stomach and threatened to kill him. When Hockman started running, Rivera followed and Hockman stabbed him in the stomach. He ran to his home, made a telephone call [2] and went to retrieve a gun from his backyard.[3] He then went looking for Rivera. He eventually found him near the Godwin home. At that point Rivera

came at Hockman with a bottle. He refused to back off, and Hockman pulled the trigger. The gun did not fire, so he pulled the trigger again, with the same result. The third time he pulled the trigger the gun fired. Rivera fell to the ground. Hockman ran over and stabbed him twice in the chest and kicked him. Hockman then went to the Godwin home, asked Jackie Godwin to wash the blood off his jacket and shoes while he buried the gun and knife in the backyard, and told Jackie and her mother what had happened. He told the police he shot and stabbed and kicked Rivera because he thought Rivera would kill him the next time, and because he was mad Rivera had punched him in the stomach.

The government also called as a witness, a man from the neighborhood who testified that he saw Rivera around 11:30 p.m., lying face up, and bleeding. Rivera tried to ask for help; he did not appear to be holding a weapon. The first police officers on the scene found a bottle with a broken neck laying five to ten feet from Rivera, near his leg. When Officer Shaw arrived, he told Homicide Detectives Kilcullen and Green about the prior incident between Hockman and Rivera, and at 2:00 a.m. the three of them went to the Godwin house. Dorothy Godwin let them in, and they spoke with her, Jackie Godwin, and Hockman. Shaw noticed Hockman was not wearing shoes and that his pants appeared to have been washed and wiped dry.

Kilcullen and Green told Hockman and Jackie Godwin "there had been an incident, a critical assault nearby and that we wanted to talk to [them], that they may have some information for us concerning that incident." Hockman and Jackie Godwin were transported to the homicide office in separate cars, and placed in separate interview rooms. Hockman was advised of his

---

2. Hockman had left the Godwin's to go to his home to call a girlfriend in Florida.

3. Hockman had purchased a gun and two sets of knives, one of which he gave to Dorothy Godwin, from a man who came into the gas station where Hockman worked and offered to sell "a few things" so that he could buy some gas. He intended to resell the gun at the gas station.

rights at approximately 2:20 a.m. He was told that he was not under arrest, that the police believed he had certain information concerning, at least, the principal person in the case, Rivera, that they wanted him to tell them if he had any knowledge of the incident, and that they were aware of an altercation a week before between Rivera and Hockman. Hockman waived his *Miranda*[4] rights and signed a waiver card at 2:20 a.m. He then told the police that he and Jackie Godwin had gone to a variety store in the neighborhood, returned to the Godwin home at approximately 8:00 p.m., and had not gone out after that. At that point, Detective Kilcullen noticed blood on Hockman's trousers and shoes. The two detectives left the room, spoke to Jackie Godwin and then returned. Hockman was arrested at 3:15 a.m., and read his rights. He signed another waiver, and fifteen minutes later dictated a written statement, which was completed at 5:00 a.m. By telephone he also told the police, who had been unable to find the gun and knife in the Godwin's backyard, precisely where he had buried them, and they recovered the weapons following Hockman's directions.[5]

The defense called four witnesses, in addition to Hockman, who testified about Rivera's violence. Donald Johnson, manager of the Amoco Station where Hockman worked, testified that he had witnessed six or seven incidents in which Rivera came to the station and hit Hockman from behind. Three days before the fatal assault Johnson saw Rivera strike Hockman in the jaw while Rivera was armed with a two foot machete knife. Willie Lee Lewis, who worked at the Amoco Station, related a similar incident. Hockman's brother-in-law described incidents when Rivera was

threatening and violent. Hockman's grandmother testified that the night before Rivera was shot, he came to her home looking for Hockman, and when she told him he was not there, he pushed his way in, knocked her to the floor, and went through the house with a knife saying he was going to kill Hockman.

## II

A hearing is not required under D.C.Code § 23–110 if "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." Thus a hearing is not required where the record contains data which "belie a prisoner's claim, and such contradiction is not susceptible of reasonable explanation," *White v. United States*, 484 A.2d 553, 559 (D.C.1984), or if the allegations are vague and conclusory, wholly incredible, or do not merit relief even if true. *Id.* (quoting *McClurkin v. United States*, 472 A.2d 1348, 1353 (D.C.1984)). Where the motion alleges ineffective assistance of counsel, however, the necessity for a hearing is increased because the nature of a defendant's complaint may necessarily involve matters outside the record. *Smith v. United States*, 454 A.2d 822, 824 (D.C.1983); *Gibson v. United States*, 388 A.2d 1214, 1215–16 (D.C.1978).

The trial judge ruled that "the facts of the case, and the entire record herein conclusively show that the Petitioner is entitled to no relief and that therefore no hearing is required." This was error since there were at least two factual issues raised in Hockman's motion which could not be resolved without evidence beyond the trial record, and which, depending on the judge's determinations, could have enti-

---

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. The government also introduced expert medical evidence that Rivera had died from "multiple internal injuries secondary to the gunshot wound [he] sustained of his neck and the stab wounds he sustained of his abdomen." The critical stab wound was inflicted while he was in an upright position. According to the deputy

medical examiner, if this stab wound had been inflicted before the shooting and second stabbings, Rivera would not have been able to walk normally, but would have been bent over and probably holding his abdomen. After he had been shot in the neck, Rivera would not have been able "to aggressively fight anyone or defend himself," although he would not have been rendered immobile.

tled Hockman to relief. If the trial judge had determined that a motion to suppress would have been granted, then he might have concluded this would have affected the result of the trial in view of the government's heavy reliance on Hockman's written statement and the absence of other comparable testimony. If the trial judge also had determined that Hockman would not have testified at trial, then he might more likely have concluded there was a reasonable probability the result of the trial would have been different. Since neither the motion nor its effect on Hockman's decision to testify were part of the trial record, a hearing was required.

To prove how Rivera met his death, the government relied on Hockman's statement to the police and Jackie Godwin's testimony about what Hockman had told her. The trial judge correctly concluded that granting a motion to suppress Hockman's statement would not have eliminated his nexus with the assault. However, the judge erred in concluding that Hockman's state-

ment to Jackie Godwin was as incriminating as his own statement to the police. Jackie Godwin's testimony [6] presented a picture of self-defense while Hockman's statement [7] had him arming himself with a knife and searching for Rivera with a gun. Moreover, Hockman initially told the police that he had been at the Godwin's since 8:00 p.m., and Jackie Godwin's testimony alone would not have suggested such a contradiction.

■ In addition, the trial judge, in ruling that the success of Hockman's defense depended on the jury believing his testimony, failed to consider, as Hockman suggested in his motion, that he might not have testified if the motion to suppress had been granted. Had his statement and the murder weapons been suppressed, the only direct evidence linking Hockman with the assault on Rivera would have been his statement to Jackie Godwin that he had tried to avoid Rivera and to stop him with-

6. Jackie Godwin testified Hockman told her that when he left his house he went in a direction to avoid meeting Rivera, Rivera jumped him as he went around a corner. Rivera chased Hockman down the street with a broken bottle. Hockman told Rivera to leave him alone. Rivera kept coming towards him, and would not stop. Hockman told him again to get back and leave him alone. Still Rivera kept saying to Hockman, come on, come on. Hockman pulled out the gun and tried to stop Rivera, but he kept coming and Hockman then pulled the trigger two or three times. Hockman also told her he was going to turn himself in. She also testified she had helped Hockman bury the gun and knife.

7. In his written statement to the police, Hockman said he saw Rivera across the street as he was leaving Jackie Godwin's house, and he returned to the Godwin home and got a knife. Then, as Hockman walked towards his home, Rivera approached and put his arm around Hockman's shoulder, tightening his grip as they walked. Hockman pulled Rivera's arm off his shoulder, and Rivera struck him in the stomach and said "I'm going to kill you." Hockman backed away and Rivera repeated the threat. Hockman ran and Rivera pursued. When Rivera caught up to him, Hockman turned and stabbed him once in the stomach and ran. Rivera remained behind, looking into some gar-

bage cans. Hockman thought "he was going after a bottle or something to use as a weapon."

Hockman returned to his house, made a telephone call and went into his backyard to retrieve a hidden gun. He then left to look for Rivera. He wanted to find out why Rivera wanted to kill him after he had helped him, by lending him $300 and letting him use the bathroom at the gas station where Hockman worked. When he was unable to find Rivera after looking in several areas, Hockman returned to the Godwin house. On his way he saw Rivera leaning against a fence. Rivera "came off the fence and went into his back and came out with a bottle." Hockman pulled out his gun and aimed it at Rivera. As Rivera kept coming towards him, he pulled the trigger but nothing happened. Rivera raised the bottle and Hockman pulled the trigger again. The gun again did not fire. He pulled the trigger a third time, the gun fired, and Rivera fell. Hockman ran over to him, stabbed Rivera twice in his chest and kicked him.

When Hockman returned to the Godwin home around 11:00 p.m., he told Jackie Godwin he had shot Rivera because Rivera "was chasing him down the avenue with a broken bottle," and that he told Rivera to leave him alone but Rivera wouldn't stop even after Hockman pulled out his gun. He also told Jackie to wash off the blood on his clothes and shoes while he buried the knife and gun in the backyard.

out shooting him but could not. Had he not testified, his statement to the police would have been inadmissible for purposes of impeachment of his testimony. *Harris v. New York*, 401 U.S. 222, 224–26, 91 S.Ct. 643, 645–46, 28 L.Ed.2d 1 (1971). Since the government still would have needed to call Jackie Godwin as a witness, Hockman would have been entitled to an instruction on self-defense. *Montgomery v. United States*, 384 A.2d 655, 660 (D.C.1978). On the other hand, since Jackie Godwin testified she had helped Hockman bury the gun and knife, the government might have argued that the police would inevitably have discovered the weapons. *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *United States v. Lewis*, 486 A.2d 729, 734–35 (D.C.1985) (Nebeker, J., dissenting on other grounds). The factors which would go into the decision whether Hockman would testify after suppression of his statement, and perhaps the weapons as well, or whether defense counsel nevertheless could reasonably conclude there was a tactical advantage in having Hockman testify, were not a matter of record.[8]

■ An evidentiary hearing was also required to evaluate whether a suppression motion would have been granted. Hockman's most serious allegation of ineffectiveness is trial counsel's failure to file a motion to suppress his oral and written statements to the police and the weapons that were buried in the Godwin's backyard. He maintained that the circumstances surrounding his going to the homicide office were virtually identical to the facts in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).[9] He also alleged his counsel should have raised prior to trial the admissibility, on *Miranda* and

voluntariness grounds, of his statement to the police. To determine that Hockman was seized under the Fourth Amendment, the court must be able to conclude that under all of the circumstances, a "reasonable man innocent of any crime" would not have thought he was free to leave. *United States v. Gayden*, 492 A.2d 868, 872 (D.C. 1985). The analysis is essentially the same for determining whether one has been seized or is in custody or is illegally detained. *Id.* at 872 n. 8. To assess his *Miranda* and involuntariness claims the court must consider Hockman's prior experience with the legal system, the circumstances of his questioning by the police, any allegations of coercion or trickery, and any delay between arrest and confession. *Bliss v. United States*, 445 A.2d 625, 630–31 (D.C.), amended 452 A.2d 172 (1982), *cert. denied*, 459 U.S. 117, 103 S.Ct. 756, 74 L.Ed.2d 972 (1983); *Rosser v. U.S.*, 313 A.2d 876, 878 (D.C.1974). The evidence at trial was insufficient to assess whether Hockman voluntarily accompanied the police to the police station for questioning, and whether once there he was free to leave or treated as though he had been arrested before the police had probable cause to arrest him. The evidence also was insufficient to assess whether his statement was inadmissible under *Miranda* and involuntary. A warrantless visit to the Godwin home at 2:00 a.m. to find Hockman, combined with almost immediate transportation to police headquarters and isolated interrogation until 5:00 a.m., at a minimum raised constitutional concerns which should have been explored at a hearing.

### III

To support his contention that his trial counsel was ineffective, Hockman relies on

8. Defense counsel destroyed his notes on the case. *See Asbell v. United States*, 436 A.2d 804, 807 (D.C.1981) (apply totality of circumstances test in determining whether counsel's performance blotted out the essence of a substantial defense).

9. Contrary to the government's argument, Hockman made a sufficient allegation in his motion to raise the claim that his Fourth Amendment

rights had been violated. In seeking a new trial on the ground of incompetent counsel's failure to file a suppression motion, a defendant must be prepared at the time of the motion hearing to introduce whatever evidence will be necessary to succeed with suppression, but is not required to make a detailed evidentiary proffer in his motion. *See Asbell, supra*, note 8, 436 A.2d at 815.

counsel's failures (1) to move to suppress his statement to the police and the murder weapons, which, he argues, was "damaging evidence of doubtful admissibility"; (2) to understand the law of self-defense and character testimony, thereby undermining the defense case by making an opening statement that contradicted the defense theory, and by permitting the government to place evidence of his bad character before the jury although he had never placed his character in issue; and (3) to investigate the case properly with the result that available objective evidence of Rivera's violent, aggressive behavior was not introduced at trial. The government responds that each of the allegations "address tactical decisions relating to the presentation of only one of appellant's three defenses, his claim of self-defense," and not his defenses of insanity and that he acted in the heat of passion.

■ Under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in order to prevail on a claim of ineffective assistance of counsel, Hockman must show both that his trial counsel's performance was deficient and that the deficient performance prejudiced the defense. *Id.* at 2064, 2071. Prejudice is shown only when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 2068.

### A.

■ Hockman maintains trial counsel should have filed a motion to suppress and his failure to do so could only be characterized as ineffective. The government argues the decision not to file a motion was tactical since admitting Hockman's statement into evidence was advantageous to him, and that Jackie Godwin's testimony was virtually as incriminating as his statement. The filing of pretrial motions falls within the ambit of trial strategy and the failure to file a motion is not ineffective representation if counsel exercised his or her best professional judgment in deciding whether there are sufficient grounds for filing a motion. *Hill v. United States*, 489 A.2d 1078, 1079 (D.C.1985); *Asbell, supra*, note 8, 436 A.2d at 804. However, the failure to file a meritorious suppression motion can constitute ineffective assistance of counsel if the failure constitutes performance below an objective standard of reasonableness under prevailing professional norms. *See generally Kimmelman v. Morrison*, —— U.S. ——, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *Strickland, supra*, 104 S.Ct. at 2064; *Asbell, supra*, note 8, 436 A.2d at 815.

Hockman argues a pretrial motion to suppress would have been successful because the police lacked probable cause to arrest him at the time he was taken to the police station; therefore, all his statements to the police and the recovery of the weapons buried in the Godwin's backyard were fruits of an illegal arrest. *Dunaway v. New York, supra*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824; *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). To prevail on this motion, the evidence would have to show that Hockman was "seized" within the meaning of the Fourth Amendment prior to the time the police had probable cause to arrest him, and before he made his incriminating statements. The test for whether a seizure has occurred is "whether under all of the circumstances a 'reasonable man' innocent of any crime would have thought he was not free to leave." *Giles v. United States*, 400 A.2d 1051, 1054 (D.C.1979). Moreover, "whether a police officer announced or expressly disclaimed an intent to arrest is not determinative of whether an arrest has occurred, and neither is a defendant's subjective belief." *Id.* Similarly, the question of whether Hockman's *Miranda* rights were violated and his statement was involuntary, must be answered by evaluating the facts of each case. *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

The government contends that regardless of the potential success of a motion to

suppress, there was a tactical advantage to the defense of allowing Hockman's written statement into evidence because it supported the theory of self-defense, and demonstrated to the jury that Hockman had asserted a claim of self-defense from the beginning. Even if the statement did show Hockman had been consistent in claiming self-defense, it actually tended to undermine his claim of self-defense by depicting him as pursuing Rivera, shooting him repeatedly and stabbing and kicking him after he had fallen. It also failed to mention, as the government brought out at trial, that Rivera previously had assaulted Hockman. In addition, the murder weapons, which were recovered by the police because of Hockman's detailed instructions, were obviously damaging to the defense. The government's ballistics expert explained that the indentations on all six cartridges in the gun tended to show Hockman had fired the gun more times than he had admitted in his statement. Finally, even if the weapons would have been found by the police, the incriminating remarks in Hockman's statement about pursuing Rivera and how many times he fired the gun, as well as his initial statement that he was at the Godwin's all night, would not have been before the jury; as we noted in Part II, Hockman's admission to Jackie Godwin was not "virtually as incriminating" as his written statement.

Without the benefit of an evidentiary hearing, it is impossible to conclude definitively that the motion to suppress would have been granted, and therefore that the failure of Hockman's trial counsel to file the motion "created 'a reasonable probability' that the result of the trial would have been different." *Strickland, supra,* 104 S.Ct. at 2068.[10] It is unclear from the record whether Hockman, who had just turned 17 years old, voluntarily accompa-

nied the police to the station for questioning. The record does not indicate what the police said to Hockman prior to his arrest, nor adequately reveal what was said to him at the police station. Accordingly, Hockman was entitled to a hearing on his Fourth and Sixth Amendment claims. *See Kimmelman v. Morrison, supra,* 106 S.Ct. at 2583 (on federal habeas corpus review, held Fourth and Sixth Amendment claims reflect different constitutional values and require different elements of proof).

**B.**

Hockman's other contentions—that trial counsel was ineffective in failing to keep evidence of Hockman's bad character from being introduced by the government, and in failing to introduce available, neutral third party evidence of Rivera's prior violent, aggressive behavior—by themselves, would constitute deficient performance by counsel but, in our view, would not have prejudiced the defense case sufficiently to alter the result of the trial and thus to meet the *Strickland* test. When considered in conjunction with the failure to file a suppression motion, however, these deficiencies contributed to altering the character of the case.

The government is not permitted to introduce evidence of a defendant's bad character until the defendant expressly "opens the door" to his character. *Johns v. United States,* 434 A.2d 463, 469 (D.C. 1981). When a defendant "testifies about a deceased victim's violent character for its relevance to the reasonable fear and/or 'aggressor' aspects of a self-defense claim, the general rule of policy against admission of evidence about the defendant's own character prevails." *Id.* at 471. Hockman never put his character in issue. In its

---

**10.** The trial court viewed Hockman's contention regarding the motion to suppress as focusing on the elimination of a nexus between Hockman and the killing, and found this was "pure wishful thinking." This is a misreading of the motion. The motion focused on the impact that suppression of Hockman's written statement would have had on his claim of self-defense, which the trial court found defense counsel had concluded was "the only viable course open" since the nature of Rivera's wounds was "far more consistent with a sustained, armed and aggravated attack than anything else" and there was no issue of identity.

rebuttal case, the government called Officer Burke, ostensibly to impeach the testimony of two defense witnesses regarding Rivera's past violence. However, Burke was asked "Did you ask [the witness] whether or not he had ever seen Mr. Hockman fight with anybody?", and responded that "Mike Hockman had a very violent temper; that at the drop of a hat, he would become violently engaged in verbal or physical fights with people that came on the Amoco lot...." Defense counsel did not move for a mistrial and moved to strike the testimony only after the trial court had counseled him on the law. Subsequently counsel withdrew the motion to strike, and introduced surrebuttal testimony that the two witnesses had never made the statements in question, testimony which the witnesses had already given.

 The record reveals that the failure to object to the government's injection of character evidence cannot be considered within the range of legitimate tactical judgments which later turns out to be an error of judgment, *Curry v. United States*, 498 A.2d 534, 540 (D.C.1985); *Oesby v. United States*, 398 A.2d 1, 8 (D.C.1977), because trial counsel was patently unknowledgeable in this area of law to make a tactical decision. *Curry, supra*, 498 A.2d at 542. We reach this conclusion based on the rules which existed at the time Hockman was tried, and not on the rule in *Johns, supra*, 434 A.2d 463, which was announced after his trial.

Trial counsel's comments to the trial judge indicate that he never recognized the problem with Officer Burke's testimony. The trial judge explained to counsel that the admissibility of evidence about Hock-

man's character turned on whether it was proper rebuttal testimony and whether it was proper to so impeach the testimony not of the defendant but of a witness. Defense counsel responded "I would suppose, Judge, what we are really stuck on is the oversight [of the government to introduce a complete proffer of why it wished to call Officer Burke in rebuttal]." At a later point counsel repeated that in his view the problem was an "absence of foundation." *Cf. Anders v. California*, 386 U.S. 738, 744, 87 S.Ct. 1396, 1400, 18 L.Ed.2d 493 (1967) (counsel must be an advocate and not a "friend of the court"). Counsel's observations to the trial judge do not suggest he appreciated, as the Supreme Court pointed out in *Michelson v. United States*, 335 U.S. 469, 476, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948), that allowing the government to introduce evidence of a defendant's bad character merely because the defendant has testified, risks having the jurors place too much weight on such evidence "and to so over persuade them as to prejudice one with a bad general record and deny him a fair opportunity to defend against a particular charge." In addition, at no time did counsel indicate that he recognized the government's proof of bad character was improperly introduced through individual witnesses' impressions, or included irrelevant and highly prejudicial characteristics and periods of time, and might have constituted grounds for a mistrial.[11] The failure to object to matters of such importance to Hockman's defense cannot be deemed tactical decisions in the absence of any indication by trial counsel throughout the trial, although being called upon by the court to do so on more than one occasion,[12] that he appreciated the substantive basis for the objection.[13]

---

**11.** Since *Johns* was decided after Hockman's trial, the trial judge might not have granted a motion for a mistrial even though he mentioned the possibility. However, *Johns'* reliance on authorities predating Hockman's trial provided strong support for defense objections on the ground called to defense counsel's attention by the trial judge, namely that the evidence was improperly introduced through individual witness' impressions. An objection on the grounds

of relevancy of some of the government's evidence about Rivera's behavior before he went into the armed services also was clearly available to defense counsel.

**12.** The record reveals repeated instances in which the trial judge found himself presented with a defense counsel who interposed no objections to actions by the prosecutor which the

### C.

Finally, Hockman's contention that defense counsel failed adequately to investigate Rivera's history of aggression presents a meritorious claim which does not require this court "to engage in vague speculation about the kind of investigation counsel might have conducted." *Curry, supra,* 498 A.2d at 540. Trial counsel has a duty to make reasonable decisions that particular investigations are unnecessary. *Kimmelman v. Morrison, supra,* 106 S.Ct. at 2588; *Strickland, supra,* 104 S.Ct. at 2066. Here trial counsel put Rivera's violent character in issue through the testimony of every defense witness. Under these circumstances trial counsel can reasonably be held to a standard which requires that prior to doing so he make a reasonable investigation into Rivera's recent history of aggression. Even a cursory investigation of military, arrest and hospital records would have revealed significant evidence about Rivera's recent past that trial counsel did not present at trial.

Based on records attached to his motion, Hockman argued that in the six months prior to Rivera's fatal injury, Rivera spent all but 24 days in prison or in the hospital. He had been hospitalized at Saint Elizabeth's Hospital on two prior occasions in 1977 because of his "hostile, threatening and assaultive" behavior. Police affidavits indicated that both hospitalizations were precipitated by Rivera's threatening others with harm. On April 23, 1977, he was hospitalized after threatening a neighbor with a brick. On April 29, 1977, he was admitted to Saint Elizabeth's after being observed throwing rocks at a person and trying to cut his own throat with a piece of glass. On May 6, 1977, he was arrested for unlawful entry, released on June 2, rearrested June 8, 1977, and placed on work release June 16, 1977. He escaped from the work release program that day, and on the same day was rearrested and committed for a competency evaluation. On October 12, 1977, he was placed on probation. The shooting occurred 13 days later.

This information would have significantly altered the jury's perception of Rivera whom the government portrayed as a "harmless pest" with personal difficulties arising from his experience in Vietnam and whose behavior was only aimed at regaining the stability of his childhood home. The only witnesses to contradict this image were Hockman's friends and his employer. No testimony was presented by disinterested police officers who had determined Rivera was dangerous to others and in need of emergency hospitalization. Nor were police or hospital records presented to corroborate the defense witnesses' testimony. Counsel also did not attempt to introduce Rivera's grandmother's testimony at Rivera's criminal trial describing his actions as frightening and violent, in contrast to her testimony at Hockman's trial minimizing the seriousness of Rivera's behavior. Since Rivera's violent character was critical to the defense case, we can conceive of no tactical reason why trial counsel would not pursue such an investigation of Rivera's behavior.

Accordingly, because Hockman's motion presented issues which required an evidentiary hearing and the effect of trial counsel's deficiencies may have affected the verdict, we reverse and remand for de novo consideration of the § 23–110 motion.

---

judge characterized as patently erroneous. The judge sua sponte placed on the record statements that error had occurred, or was in the process of occurring, and sought to ascertain whether defense counsel realized error had occurred.

**13.** *Cf. Johns, supra,* 434 A.2d at 471–72 ("where the only persons present at a homicide were the deceased and the accused, an erroneous evidentiary ruling with [the] consequence [that the defendant foregoes testifying] cannot be harmless").