**James A. WOODARD, Jr., Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 94–CF–1542, 96–CO–1696**

District of Columbia Court of Appeals.

Nov. 5, 1998.

Richard Seligman, Washington, DC, appointed by the court, for appellant.

Simone E. Ross, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr., Stephanie G. Miller and Joan Draper, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, RUIZ and RANKIN,* Associate Judges.

RUIZ, Associate Judge:

James A. Woodard was indicted, along with a co-defendant, James E. Easley, in connection with two attempted robberies, one resulting in murder, in Mount Pleasant in April 1994.[1] Easley, the co-defendant, committed suicide while incarcerated pending tri-

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (1995).

1. The indictment charged Woodard with one count of first-degree murder while armed (felony murder), in violation of D.C.Code §§ 22–2401 and –3202 (1996); two counts of attempt to commit robbery while armed, in violation of D.C.Code §§ 22–2902 and –3202; two counts of possession of a firearm during a crime of violence or dangerous offense, in violation of D.C.Code § 22–3204(b); and one count of carrying a pistol without a license, in violation of D.C.Code § 22–3204(a).

al. Woodard was tried by jury and found guilty in connection with the first of the two incidents of attempt to commit robbery while armed, possession of a firearm during a crime of violence or dangerous offense, and carrying a pistol without a license; he was acquitted of all other charges. Woodard was sentenced to ten to thirty years, with a five-year mandatory minimum, for attempted robbery while armed; followed by five to fifteen years, with a five-year mandatory minimum, for possession of a firearm during a crime of violence and a one-year concurrent sentence for carrying a pistol without a license.

We consider Woodard's direct appeal and appeal from denial of his motion to vacate the judgment against him pursuant to D.C.Code § 23–110 (1996). Woodard contends that he was prejudiced by the ineffective assistance of his trial counsel, who failed 1) to move for severance of charges stemming from the two separate incidents; 2) to investigate the voluntariness of a statement made by Woodard to a grand jury and to move that it be suppressed; 3) to request redaction of "other crimes" testimony from Woodard's grand jury statement; 4) to investigate and present alibi witnesses; and 5) to cross-examine for bias the government's key witness to the first incident. He also contends that the trial court erred in denying his § 23–110 motion without a hearing because the court lacked information in the record to resolve several factual issues raised in his motion.

We reverse and remand for a hearing. The trial court erred when it repeatedly explained away trial counsel's inaction as "trial tactics" without a sufficient foundation for doing so, and when it held Woodard to a higher burden than is required for a claim of ineffective assistance of counsel. A hearing is required because there are factual disputes clearly raised by the record and a lack of factual record support for some of the trial court's determinations.

We are mindful that, on remand, the hearing will be held by a judge other than the trial judge, now retired, who considered and denied Woodard's § 23–110 motion. Therefore, although we stop short of granting a new trial, we address those substantive issues that, based on the record, raise concerns that will need to be addressed at the hearing. *See Cross v. Harris,* 135 U.S.App.D.C. 259, 269, 418 F.2d 1095, 1105 (1969) ("[S]ound judicial administration require[s] us to make our remand order intelligible to the court and parties below."); *id.* at n. 64 ("The distinction between holding and dictum is not whether the point in question had to be decided in order that the court's mandate could issue. The distinction turns on whether the court, in stating its opinion on the point, believed it necessary to decide the question or was simply using it by way of illustration of the case at hand.") (citing cases); *cf. Umana v. Swidler & Berlin, Chartered,* 669 A.2d 717, 720 (D.C.1995) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.") (citations and internal quotations omitted).

I.

## A. The Trial

The evidence at trial concerned two separate attempted armed robberies which occurred within several blocks of each other in the Mount Pleasant neighborhood on the night of October 10, 1994, and early morning hours of October 11, 1994.

### The Incident at the Easley Home

Robert Easley (Robert), the 17–year–old brother of deceased co-defendant, James Easley (James), testified that he returned to his Mount Pleasant home on the evening of April 10, 1994, at about 9:30 p.m., and found Woodard sitting on the front porch, playing with a black revolver. Woodard greeted Robert, and then said that "[h]e was ready to do something. [Robert] saw what [sic] he was going to rob somebody." James came into the house, spoke with Woodard on the porch, and then left. After James left, Woodard sat down with Robert, pulled out his gun, and began to move it around until Robert told him to "[g]et out of my face before it go off," after which Woodard put the gun down. James returned a while later, "high" on cocaine, and Woodard asked James "was *he* still going to do that" (emphasis

added), and James said "[a]ll right. I be back. I'm going to go find somebody."

After a while, James returned to the house, and Woodard "asked him again, 'You still going to do that?'," to which James responded, " 'I found somebody, Martin's Spanish brother—cousin.' " James left the house, and Woodard sat at the table with the gun in his hand, wiped off its bullets, and then replaced them. James returned, told Woodard that Spanish Martin's cousin was in the backyard, and began to look around the dining room for something to "fake sell" so that they could rob him. As James walked out the back door, Woodard ran out the front door; Woodard's shadow was visible running to the backyard, and then Woodard stood in the backyard, holding the gun. Spanish Martin's cousin ran into the house through the back door, looking scared, and then ran out the front door.

Tomás Mejea, the cousin of a man nicknamed "Martin," testified as follows: a man he identified as "my cousin's brother-in-law" approached him at around 10:30, one night in April 1994, and offered to sell him a chain for forty dollars. After Mejea followed the man to the back porch of his house, the man offered to sell him a pistol, which he declined, and the man then returned to the house. At that point a different black man appeared in the alley and pointed a gun at Mejea. Mejea ran into the house and then out the front door and away. Once he was out on the street, Mejea saw a black man, "[m]aybe ... the same one as before ... pointing at me again." Mejea later selected James Easley's picture from a police photo array as the man who lured him to the house, but he failed to identify Woodard's picture in a subsequent photo array, pointing instead to another man and stating that the picture looked like the man with the gun.

Woodard himself did not testify, but the prosecutor read into the record an unredacted grand jury statement given by Woodard in the case against James Easley after prosecutors had told Woodard that he was not a target of their investigation. In that statement, Woodard said that he was at the Easley home on the evening of April 10, 1994, to visit his daughter, whose mother is James's sister. Woodard also confirmed that he was in the Mount Pleasant neighborhood that day "hustling" crack cocaine, and that he had sold James Easley two rocks of crack cocaine on the evening in question.

*The Incident at Heller's Bakery*

Woodard's grand jury testimony also placed him at the scene of the second incident: James told Woodard that he was going to sell a radio and a gun to people who were working at Heller's Bakery. It occurred to Woodard that James might be going to rob the people at the bakery rather than sell them the gun, so he tried to go after James, but when he got to the bakery, James was already inside and struggling with one of the workers. Woodard said "James, what the hell you doing?," and at that moment, the worker tried to take the gun away and James shot the worker twice. James threatened to shoot Woodard, too, so Woodard ran out the back door of the bakery and fled the scene in a cab.

José Amilcar Arias, the only other worker present at the bakery that night, testified that Antonio Romero, his supervisor, allowed a man he knew as "Jim" to enter the bakery, and that he recognized Jim as someone who had previously gone to the bakery to sell things. Once Jim entered the bakery, he pulled out a gun and pointed it at Romero, and Romero then jumped on Jim. Arias ran to the door to get an iron bar, when the door opened and a person came in. Just then, Arias heard Jim fire a shot at Romero. The other man tried to grab Arias, and as Arias was running, with the other man following him, he heard a second gunshot. Arias identified James Easley's picture from a police photo array the morning after the fatal shooting, and again in court, but he testified that he would not be able to recognize the second man who grabbed him by the door.

*B. § 23–110 Motion*

After he was convicted in connection with the incident at the Easley home involving the attempted robbery of Tomás Mejea, Woodard filed a motion to vacate the judgment pursuant to D.C.Code § 23–110, contending that his trial counsel performed so poorly that his Sixth Amendment right to effective

assistance of counsel was violated, and he was denied a fair trial. In its order denying Woodard's motion, the trial court determined that "an evidentiary hearing is unnecessary since the motion failed to state a factual claim which would require a hearing." The trial court also held that Woodard's motion failed to satisfy the prejudice prong of the *Strickland*[2] test for an ineffective assistance of counsel claim, incorrectly defining that standard as requiring that Woodard *"prove that he would have been found not guilty."*[3] (Emphasis added.)

As to counsel's failure to request severance of the joined charges, the trial court concluded that joinder was proper and that, in any event, the failure to request severance was harmless. Concerning counsel's failure to investigate whether Woodard's statement to the grand jury was involuntary and should have been suppressed, the trial court deemed the argument to have been waived by Woodard because he had been fully advised of his rights before he testified. The trial court dismissed as "tactical and strategic decision[s] ... within accepted professional norms" some of trial counsel's failures to act which Woodard complains amounted to ineffective assistance of counsel: the failures to request that Woodard's grand jury statement be redacted to remove references to Woodard's "business" selling crack cocaine, to interview and present Woodard's alibi witnesses, and to cross-examine Robert Easley for any bias against Woodard. The government did not present an affidavit from Woodard's trial counsel explaining what his tactical decisions were at critical stages of Woodard's pre-trial proceedings and at trial; in its order denying Woodard's § 23–110 motion, the trial court repeatedly "adopt[ed] the government's analysis for a possible reason" for counsel's tactical decisions.

## II.

A convicted defendant in custody may attack his sentence on constitutional grounds at any time by filing a motion under D.C.Code § 23–110 (1996). The trial court must promptly grant a hearing, "[u]nless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief," D.C.Code § 23–110(c), and "any question regarding the appropriateness of a hearing should be resolved in favor of holding a hearing," *Gillis v. United States,* 586 A.2d 726, 728 (D.C.1991). "This court has held that trial courts should only refuse a hearing in extremely limited circumstances when the allegations include ineffective assistance of counsel." *Gaston v. United States,* 535 A.2d 893, 901 (D.C.1988). When a § 23–110 motion is based on a complaint of ineffective assistance of counsel and the claim "involves facts not contained in the record," the trial court must grant a hearing, *Gillis, supra,* 586 A.2d at 728 (citation omitted), unless "the claims (1) are 'palpably incredible'; (2) are 'vague and conclusory'; or (3) even if true, do not entitle the movant to relief." *Troy P. James v. United States,* 718 A.2d 1083, 1089 (D.C.1998) (quoting *Newman v. United States,* 705 A.2d 246, 261 (D.C.1997) quoting in turn *Gregg v. United States,* 395 A.2d 36, 39 (D.C.1978)).

In order to prevail on a claim of ineffective assistance of counsel,

> [a] convicted defendant ... must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.

*Strickland, supra,* 466 U.S. at 690, 104 S.Ct. 2052. In addition to showing counsel's deficient performance, the convicted defendant must demonstrate that he was prejudiced by counsel's deficient performance by showing

---

**2.** *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (requiring only a "reasonable probability" of a different outcome).

**3.** At another point in the order, the trial court repeated that "[i]n order to prove that trial counsel's failure to move for a motion to suppress ... constitute[d] a Fifth Amendment ineffective assistance of counsel claim, defendant must *prove* that ... the motion would have changed the outcome of the trial." (Emphasis added.)

"that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687, 694, 104 S.Ct. 2052. "Reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

When reviewing the trial court's denial of a § 23–110 motion, "the appellate court should inquire whether the trial court's reasoning is substantial and supports the trial court's action. To exercise its judgment in a rational and informed manner the trial court should be apprised of all relevant factors pertaining to the pending decision." *Johnson v. United States,* 398 A.2d 354, 365 (D.C.1979) (citing *United States v. Lewis,* 157 U.S.App.D.C. 43, 54, 482 F.2d 632, 643 (1973)). It is not the court's role to second-guess the reasonable tactical decisions of counsel. *See Strickland, supra,* 466 U.S. at 689, 104 S.Ct. 2052. However, "the trial court cannot presume that when counsel states that he had some 'reasons' for a decision, that his 'reasons,' whatever they may have been, were sound." *Gillis, supra,* 586 A.2d at 729.

### III.

We now turn to the specific deficiencies that Woodard contends deprived him of the effective assistance of counsel to which he is entitled under the Sixth Amendment.

#### A. Failure to Move to Sever the Charges

The trial court summarily rejected Woodard's claim that his trial counsel was ineffective in failing to move at any time to sever the charges against him relating to the first incident behind the Easley house from the second incident at Heller's Bakery. The court concluded that trial counsel could not be faulted for failing to move for severance when the motion would not be granted, and that Woodard suffered no prejudice in any event because he was acquitted of the more serious felony murder charge relating to the second incident and convicted of only the lesser charges arising from the first incident.

The trial court "agree[d] with the Government's analysis [finding joinder proper] that both attempted robberies while armed and the felony murder violate the same statute, have ... similarities which properly constitute a common scheme, and, in turn, have the same required proof." The similarities proposed by the government and adopted by the court as establishing a common scheme included: 1) a gun as the weapon of choice; 2) the same locality; 3) James Easley as the main alleged perpetrator; 4) a black male accomplice; 5) a similar time frame; 6) a feinted offer to sell; and 7) Spanish-speaking immigrant victims.

The propriety of joinder of distinct offenses is governed by Super.Ct.Crim.R. 8(a),[4] which provides:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged ... are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan.

"[C]ourts have ... permitted the joinder of offenses under the 'same or similar' provision only where there is a substantial degree of similarity among the crimes charged." *Roper v. United States,* 564 A.2d 726, 729 (D.C. 1989). This court reviews joinder determinations under Rule 8 *de novo. See id.*

Even if joinder is proper, Super.Ct.Crim.R. 14 provides that

> [i]f it appears that a defendant ... is prejudiced by a joinder of offenses ..., the Court may order an election or separate trials of counts ... or provide whatever other relief justice requires.

Severance is appropriate to avoid prejudice to a defendant "from the jury inferring criminal disposition from some charges or *cumulating the evidence* and finding guilt when it would not have had the evidence been presented separately." *West v. United States,* 599 A.2d 788, 792 (D.C.1991) (emphasis added). This court held in *West:*

4. Because Woodard's co-indictee, James Easley, died before trial, Woodard was tried alone.

Thus, we need not address the propriety of joinder of defendants. *See* Super.Ct.Crim.R. 8(b).

[O]ffenses of a similar character should be severed " 'unless 1) the evidence as to each offense is separate and distinct, and thus unlikely to be *amalgamated in the jury's mind into a single inculpatory mass,* or 2) the evidence of each of the joined crimes would be admissible at the separate trials of the others.' "

*Id.* (quoting *Cox v. United States,* 498 A.2d 231, 235 (D.C.1985)) (quoting in turn *Bridges v. United States,* 381 A.2d 1073, 1075 (D.C. 1977), *cert. denied,* 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978)) (emphasis added). "[I]n any given case the court must weigh prejudice to the defendant caused by the joinder against the obviously important considerations of economy and expedition in judicial administration." *Drew v. United States,* 118 U.S.App.D.C. 11, 14, 331 F.2d 85, 88 (1964). The denial of a motion to sever is reviewed for abuse of discretion. *See West, supra,* 599 A.2d at 791.

We need not decide whether initial joinder was proper because, even if we assume that the offenses were properly joined, we are unpersuaded by the trial court's conclusion that Woodard was not prejudiced by his attorney's failure to move for severance, a conclusion that it based on the jury's acquittal of Woodard for the crimes at the bakery. Implicitly, the court determined that the verdict demonstrates that the jury was able to evaluate the proof of the two incidents separately.[5]

On appeal, the government does not argue that severance would have not been proper because each offense would have been admissible at a separate trial of the other but, like the trial court, relies on the argument that Woodard's acquittal of the charges stemming from the second incident implies that the jury did, in fact, keep separate evidence of the two incidents. There is abundant evidence in the trial record, however, to suggest that the government's presentation of the joined offenses was "likely to be amalgamated in the jury's mind into a single inculpatory mass," and that therefore Woodard may have been prejudiced by his counsel's failure to move for severance. For example, the first substantive question put to Tomás Mejea, the victim of the attempted armed robbery behind the Easley house, was "Are you familiar with Heller's Bakery on Mt. Pleasant Street?" The prosecutor continued with some brief questions about where Mejea and his cousin, Martin, lived, but quickly returned to ask, "Did there come a time when you found out that someone had been killed at the bakery?" The prosecutor continued, "Now, the night before you found out about something happening at the bakery, did something happen to you?"

Similarly, during her closing, the prosecutor sought to interweave the facts of the two incidents to create a "single inculpatory mass":

It was a night of violence [perpetrated] by two men together working as a team. They may have exchanged roles, but you know, ladies and gentlemen, that no one was selling anything to anyone that night; not to Mr. Mejea and not to Pedro Antonio Romero at the bakery.

Under these circumstances, we disagree with the rationale for the trial court's determination that the failure to file a motion to sever was harmless to Woodard. The fact that Woodard was acquitted of the more serious offenses arising from the second incident does not mean that his convictions on the offenses related to the first incident were not tainted by evidence presented concerning the second incident. We note, in particular, that the government's evidence of Woodard's participation in the first incident, for which he was convicted, was weak and circumstantial, and that Tomás Mejea, the victim, who had two occasions to view his assailant on the night of the incident, did not identify Woodard as one of the perpetrators, and, instead, selected another person from a photo array.

*B. Failure to Move to Suppress Woodard's Grand Jury Statement*

The trial court concluded that Woodard was not prejudiced by his counsel's failure to move to suppress Woodard's grand jury

---

5. This court held in *Roper,* however, that where two or more offenses are misjoined under Rule 8, and the defendant is acquitted of one of those offenses, ... the misjoinder can not, at least under a theory of mutual admissibility, be held to be harmless. *Roper, supra,* 564 A.2d at 732.

statement, on three grounds. First, the court determined that Woodard's statement to the grand jury was voluntary because Woodard heard and waived his Fifth Amendment rights prior to testifying. Second, the trial court held that "trial counsel's request to have the issue considered as a preliminary matter demonstrates that counsel reviewed the Fifth Amendment question prior to the actual trial when he raised it with the Court.... Counsel's actions were reasonable and his arguments were thoroughly advocated." Third, the court "[found] no deceit or trickery in the Government's assertion to [Woodard, prior to testifying,] that he was not a target of the grand jury investigation."

Underlying the question of whether Woodard's grand jury testimony was given voluntarily, which was the court's first finding, is whether Woodard would have elected to testify at all had he been able to consult with his attorney. Woodard submitted an affidavit in June 1995 in which he asserted that, "I tried to contact [trial counsel] several times before I testified before the grand jury, leaving messages for him that I was in trouble and needed to speak with him, but he never returned my calls." Woodard also stated in his affidavit, "I told the prosecutor before I went in to the grand jury that I wanted to talk to my lawyer but she said there was no point to that because my lawyer could not go into the grand jury room with me." Woodard further asserted that "I was told by a detective that if I did not testify before the grand jury, I would be charged with murder." The government submitted no evidence to rebut the allegations in Woodard's affidavit concerning the inaction of Woodard's counsel or the statements Woodard alleges were made by government representatives before Woodard went into the grand jury.[6]

■ The court's order denying Woodard's § 23–110 motion makes no mention of Woodard's contentions in his affidavit that his requests for assistance of counsel went unanswered by both his attorney and the government, and that his testimony was

coerced by the government's threatened prosecution for murder. In *Staton v. United States,* 466 A.2d 1245 (D.C.1983), a case with highly similar facts, this court held,

> [A]ppellant's ... allegations, if true, raise grave questions about the voluntariness of his confession....
>
> ....
>
> From the record before us, we are unable to determine the basis of the trial court's decision; hence we are unable to determine whether the court's finding of voluntariness was supported by the record. More specifically, we are unable to determine whether the trial court concluded that 1) appellant's uncorroborated testimony concerning coercion was incredible, although unrebutted, or 2) some or all of the coercive statements were in fact made, but, given the totality of the circumstances, did not render appellant's statements involuntary.

*Id.* at 1252–53. On this record, lacking any statement from trial counsel or the government rebutting Woodard's allegations, as in *Staton,* we conclude that the trial court must conduct a factual inquiry concerning the actions of counsel and the government in response to Woodard's allegations that his grand jury testimony was involuntary.

■ The trial court's second ground for finding no prejudice from trial counsel's failure to move to suppress Woodard's grand jury testimony was that counsel's actions seeking to review the issue of the grand jury testimony as a "preliminary manner" were "reasonable" and "his arguments were thoroughly advocated." The court's determinations are not supported by the record. Woodard's counsel requested that the grand jury testimony be suppressed not as a "preliminary, matter," as the court found, but rather on the second day of trial, long after the prosecutor had already made use of Woodard's damaging grand jury statements during the government's opening statement. Furthermore, counsel conceded that he was *utterly unprepared* to support his mid-trial request to suppress the grand jury statement

---

**6.** Instead, the government expressed a willingness to provide witnesses to the discussions with

Woodard before he testified at the grand jury.

with any case law or other legal authority.[7] Significantly, after trial counsel made his mid-trial motion to suppress Woodard's grand jury testimony, counsel admitted that he had still, as of the second day of trial, not viewed a videotaped statement by James Easley in which James implicates Woodard as the gunman in the murder of Romero at Heller's Bakery. Upon hearing trial counsel's admission, the trial judge called a recess, and the judge and Woodard's counsel sat together in the empty courtroom and watched the videotape. Therefore, with respect to the trial court's third ground for concluding there was no prejudice, that there was no "deceit or trickery" in the government's pre-grand jury statement to Woodard that he was not a target of the investigation of the murder at Heller's Bakery, the trial court knew that trial counsel had not been in a position, even when he belatedly moved to suppress, to intelligently argue the government's motives when it told Woodard that he was not a target of the grand jury investigation. Counsel also had no knowledge at that time as to whether Easley's videotaped statement implicated Woodard in the first armed robbery, at the Easley home. While "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland, supra*, 466 U.S. at 689, 104 S.Ct. 2052, counsel's tardy and unsupported motion to suppress Woodard's grand jury testimony surely falls outside of that range. Moreover, in light of the fact that when he considered the § 23–110 motion, the trial judge had seen the videotape of James Easley implicating Woodard, the trial court's conclusion, without explanation or a hearing, that there was no "deceit or trickery" appears unsupported by the bare record before us.

▮ Whether the government indeed threatened Woodard with a murder charge if he did not testify before the grand jury, or diverted him from consulting with his attorney before he did so, or misled him into thinking he was not a target, are open questions of fact that must be tested at a hearing. Whether all or some of those alleged facts, even if true, undercut the voluntariness of his grand jury testimony despite the *Miranda* waiver, is a question that only a hearing can begin to answer. *See Miller v. Fenton*, 474 U.S. 104, 115, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (holding that, under 28 U.S.C. § 2254(d) "the ultimate question of the admissibility of a confession merits treatment as a legal inquiry requiring plenary ... review)".

*C. Defense Counsel's Purported "Tactical Decisions"*

Even applying a deferential standard in evaluating counsel's performance, we cannot agree with the trial court's determination on this limited record without a hearing that each of the following three claimed deficiencies of trial counsel reflected reasonable "tactical decisions of counsel." If anything, what the trial record reflects are inaction and lack of preparation.

*1. Failure to File a Motion to Redact Portions of the Grand Jury Statement*

▮ Woodard complains that his trial counsel was ineffective in failing to file a motion to redact references in his grand jury testimony that Woodard was in the "business" of selling drugs. The trial record clearly reflects that counsel had not even looked at Woodard's grand jury testimony as late as the afternoon of the first day of trial. The court asked counsel in a bench conference, "I don't know if there is ... any statement [in the grand jury testimony] that on its own is objectionable. Have you gone through the statement to see about that, [Counsel]?" Defense counsel replied, "No." The court thus knew that defense counsel could not have made a reasoned tactical decision on whether or not to seek to redact the grand jury statement before the trial was

---

7. Trial counsel stated to the court:
 I'm sure that the government will object to the lateness of this request, this motion [to suppress the grand jury testimony]—but, again, it's an issue that I have wrestled with for a number of days, and I feel compelled to raise it even at this late stage.... Now, I don't have any supporting authorities. I haven't researched the issue. But, there is *something* about the whole process which we would suggest flies in the face of due process, and the Court should examine it.

well underway, and the court lacked any other explanation from counsel as to what his motives might have been. Thus, the record does not support the court's conclusion that trial counsel's failure to redact Woodard's admission to other crimes was an unreviewable tactical decision of counsel.

 The trial court further concluded, without explanation, that Woodard's case did not suffer "any prejudice as a result of trial counsel's failure to ... request redaction" of the other crimes evidence in Woodard's grand jury testimony. Prejudice to a criminal defendant from "other crimes" evidence is well recognized, and safeguards—including redaction of testimony—exist to prevent such prejudice. *See Drew, supra*, 118 U.S.App. D.C. at 15–16, 331 F.2d at 89–90. In this case, the record reflects that the prosecutor used Woodard's statement before the grand jury to paint a negative picture of Woodard by explaining in the first minutes of her opening statement, that Woodard had been selling drugs before going to the Easley home. The prosecutor also read Woodard's own words from his grand jury testimony in unredacted form about his "hustling" rocks of crack cocaine. Thus, the record does not support the trial court's conclusion that there was not "any prejudice" from trial counsel's failure to seek redaction of the evidence of other crimes in Woodard's grand jury testimony.

### 2. Failure to Interview Alibi Witnesses

 The trial court similarly dismissed as a "trial tactic" counsel's failure to interview alibi witnesses, "adopt[ing] the Government's analysis for a possible reason that these witnesses were not utilized." The government's proffered reason appears to be that the alibi witnesses' testimony "would have contravened trial counsel's strategy for handling [Woodard's] grand jury testimony which was in accord with trial counsel's calling the 'girl' to testify who [Woodard] spoke with at the bakery." As we have already discussed, however, had trial counsel moved to sever the offenses related to the two separate incidents, there might not have been any

need to explain Woodard's presence at Heller's Bakery in the trial of the offense for the incident at the Easley home. One of counsel's deficiencies cannot be used to justify a second deficiency. In addition, the trial court relied on the fact that one of the alibi witnesses—Woodard's aunt—could not account for Woodard's location the entire evening, which would "leave periods of time when [Woodard's] whereabouts were not able to be verified, thus, giving [Woodard] the opportunity to be elsewhere on this night." This conclusion is not supported by the record because it ignores the cumulative effect of the affidavits of Woodard's aunt and father, submitted by Woodard in support of his § 23–110 motion, that they were "ready, willing and able" to testify that Woodard was in Southeast, Washington at around the time of the armed robbery behind the Easley house in Northwest Washington.[8] Particularly in light of the lack of any eyewitness identification of Woodard with respect to either incident, Woodard could have been prejudiced by his trial counsel's failure to even contact, much less call to testify, Woodard's alibi witnesses. As this court concluded in *Gillis*, "[t]he record is devoid of any meaningful explanation as to why a potential defense was not pursued. At a minimum, there was a serious question regarding the need for a hearing." *Gillis, supra*, 586 A.2d at 729 (citation omitted).

### 3. Failure to Cross-Examine Key Government Witness for Bias

 As to Woodard's complaint that trial counsel was ineffective for failing to cross-examine Robert Easley, the government's key witness against Woodard, regarding any bias Robert Easley might have held against Woodard, there *is* evidence in the record of a trial strategy or tactic—but counsel's decision not to try to impeach Robert Easley for bias appears to go *against* that strategy. Trial counsel alluded to a theory of the defense midway through trial, and developed that theory in his closing: that the Easley brothers conspired to place a gun in Woodard's hand earlier in the evening in order to

---

**8.** The statements in Woodard's father's affidavit as to when Woodard was with his father could

account for the time that Woodard's aunt's affidavit states Woodard left her house.

implicate him as the gunman in Romero's murder at Heller's Bakery. Any decision not to examine Robert Easley for bias runs counter to this strategy articulated by trial counsel, considering the various potential motives for bias in this case—particularly as Robert's brother James committed suicide in jail after Woodard had identified James before the grand jury as the shooter in the murder at Heller's Bakery. There is no evidence suggesting a contrary strategy in the § 23–110 record. Apparently addressing the prejudice prong of *Strickland,* the trial court suggests in its order denying Woodard's § 23–110 motion, that even if trial counsel had attempted to cross-examine Robert Easley for bias against Woodard, the effort would not have succeeded because in his trial testimony Robert Easley implicated his brother James as well as Woodard. We are baffled by this observation; by the time that Robert Easley testified at Woodard's trial, his brother James was already dead. Thus, there would be little incentive for Robert to "protect" his brother from incrimination after his death. He might well, however, be resentful against Woodard for having precipitated James' suicide. The record is silent on the issue. In sum, the present record lacks a factual basis for concluding either that failure to examine Robert Easley for bias was a reasonable trial tactic or that there was not a reasonable probability that a different tactic would have altered the outcome of the trial.

## IV.

Addressing the issue of prejudice, the trial court at several points articulated an incorrect standard, stating that Woodard "must demonstrate a reasonable probability that without counsel's errors, the fact finder would have had a reasonable doubt of the defendant's guilt. [citing *Strickland, supra,* 466 U.S. at 695, 104 S.Ct. 2052.] Moreover, the defendant *must prove that he would have been found not guilty.*"[9] We are not yet prepared to conclude that the prejudice to Woodard from any one of his counsel's defi-

ciencies was so severe as to satisfy the correct standard, whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. 2052. Nevertheless, when we consider trial counsel's many apparent errors together—his failure to move to sever the joined charges, to suppress or redact Woodard's grand jury statement, to interview or present alibi witnesses and to cross-examine Robert Easley for bias—we are sufficiently troubled by the record to conclude that "these deficiencies [may well have] contributed to altering the character of the case." *Hockman v. United States,* 517 A.2d 44, 52 (D.C.1986) (reversing the summary denial of defendant's § 23–110 motion and remanding for a hearing to determine whether trial counsel's failure to move to suppress inculpatory statements, in conjunction with counsel's failure to try to exclude character evidence of the defendant and present character evidence of the victim, was sufficient to satisfy the *Strickland* test). Recognizing the extensive case law in this jurisdiction establishing the presumption in favor of granting a hearing in a § 23–110 ineffective assistance of counsel claim, and the lack of factual support in the record for some of the trial court's determinations, specifically, that alleged deficiencies were permissible "tactical decisions" of counsel and that Woodard waived his objection to admission of his grand jury statements, we need only hold, at this juncture, that the trial court erred in denying, without a hearing, Woodard's claim of ineffective assistance of counsel.

*Reversed and remanded.*

---

9. See also *supra* at 971 and note 3.